Filed 11/2/15  Ruelas v. Harper CA4/2
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| GUILLERMO RUELAS et al., | E051961 |
| Plaintiffs and Respondents, | (Super.Ct.Nos. RCVRS083017 & RCVRS085541) |
| v. | |
| JERRY HARPER et al., | O P I N I O N |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  David A. Williams, Judge.  Affirmed in part; reversed in part with directions.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Chief Assistant Attorney General, Alicia M.B. Fowler, Acting Chief Assistant Attorney General, Steven M. Gevercer and Kristin G. Hogue, Assistant Attorneys General, Richard J. Rojo, Joel A. Davis, Martin Ageson and Donna M. Dean, Deputy Attorneys General, for Defendants and Appellants Jerry Harper and Xavier Ruiz.

1

Child & Marton, Bradford T. Child and Michael R. Mauge for Defendant and Appellant James Shelby.

Law Offices of Gary A. Dordick, Gary A. Dordick; The Eisenberg Law Firm, Cara L. Eisenberg; Law Offices of Peter Goldstein and Peter Goldstein for Plaintiffs and Respondents Guillermo Ruelas, Oscar Miranda and Alejandro Espinoza.

Law Offices of Marjorie G. Fuller, Marjorie G. Fuller and Mitchell A. Shapiro for Plaintiff and Respondent Martin Mendoza.

## I. INTRODUCTION

At relevant times from 2002 through 2004, plaintiffs Guillermo Ruelas, Oscar Miranda, Alejandro Espinoza, and Martin Mendoza were wards at the Heman G. Stark Youth Correctional Facility (Stark). Stark is part of the Department of Juvenile Justice, formerly the California Youth Authority (CYA).[1] While they were wards, defendant James Shelby, a Youth Correctional Counselor (YCC) at Stark, committed various sexual acts with them, for which plaintiffs sued Shelby and his superiors, defendants Jerry Harper and Xavier Ruiz.

Defendants all appeal from a judgment in favor of Ruelas, Miranda, and Espinoza in their action under title 42 United States Code section 1983 (section 1983); Shelby appeals from a judgment in favor of Mendoza in his action for state law claims of

---

[1] For consistency with the parties' designation and with the record below, we will use the term CYA throughout this opinion.

2

negligence and violation of Civil Code section 52.4; and Ruiz appeals from a judgment in favor of Mendoza in his action under title 42 United States Code section 1983.

Defendants all contend the trial court erred by:

(1) Failing to dismiss Mendoza's action for failure to exhaust his administrative remedies.

(2) Disclosing evidence to plaintiffs in violation of Evidence Code section 1045 and admitting that evidence at trial.

(3) Awarding attorney fees in favor of Ruelas, Miranda, and Espinoza.

Shelby adopts the arguments of Harper and Ruiz, who in turn adopt Shelby's arguments.

Shelby contends the trial court committed reversible error by:

(1) Permitting plaintiffs to raise his pretrial invocation of his Fifth Amendment privilege against self-incrimination.

(2) Allowing officers to read to the jury inadmissible hearsay statements from investigative reports.

(3) Allowing expert opinion testimony on the ultimate issue.

(4) Admitting evidence of prior bad acts under Evidence Code section 1101.

(5) Admitting evidence of his HIV status.

(6) Excluding the testimony of his witnesses (Elizabeth Landeros & Salvador Zendejas).

(7) Excluding his proffered impeachment evidence.

3

Harper and Ruiz contend:

(1) The evidence was insufficient to establish:

(a) they had actual knowledge of a substantial risk of the constitutional injuries plaintiffs suffered;

(b) the subjective belief element of a deliberate indifference claim against prison supervisory officials;

(c) the conscious disregard element of plaintiffs' failure to protect claim;

(d) the causation element of plaintiffs' failure to protect and cruel and unusual policy claims; and

(e) the specific practice or policy that underlay the cruel and unusual policy claims.

(2) The trial court erred in admitting evidence of irrelevant accusations of other wards and other extraneous and prejudicial information.

(3) The trial court erred in its instructions to the jury concerning, among other things:

(a) the actual knowledge element of plaintiffs' failure to protect claim;

(b) subjective belief as an independent element of plaintiffs' claim; and

(c) the deference to be given to prison officials' discretion.

(4) The trial court erred in admitting evidence of actions or omissions of others irrelevant to plaintiffs' failure to protect claim.

(5) They were entitled to judgment based on qualified immunity.

(6)  The trial court erred in excluding evidence of what they actually knew.

We conclude that Mendoza failed to exhaust his administrative remedies and, therefore, we reverse the judgments in his favor.

We further conclude as to Harper and Ruiz that the trial court erred by:

(1)  Failing to give requested instructions on the elements of a claim of deliberate indifference based on a policy or practice.

(2)  Admitting evidence that was irrelevant to establish knowledge or notice.

(3)  Not allowing into evidence certain exculpatory comments found in various investigative reports.

As to Harper, we find further error in admitting polygraph results into evidence.

We find however that the cumulative nature of the errors is harmless.

In regard to Shelby, while error occurred as to the admission of certain evidence, he has failed to establish that the  error resulted in a miscarriage of justice.

As such, we affirm the judgment in favor of Ruelas, Espinoza, and Miranda against defendants Shelby, Ruiz, and Harper.

## II.  FACTS AND PROCEDURAL BACKGROUND

Following dismissal of other defendants and other claims, Ruelas, Miranda, and Espinoza proceeded to trial against Shelby, Ruiz, and Harper on a cause of action for violation of title 42 United States Code section 1983.  Mendoza's separate complaint was consolidated with that of the other plaintiffs, and Mendoza proceeded to trial on state law causes of action against Shelby, including violations of Civil Code section 52.4 and

5

negligence, and on a cause of action against Ruiz under title 42 United States Code section 1983.

In their briefs, plaintiffs and defendants cite to various exhibits that were not admitted into evidence in the trial court. Such citations do not satisfy the parties' obligation to cite to evidence in the record to support contentions on appeal. (*Connolly v. Trabue* (2012) 204 Cal.App.4th 1154, 1166, fn. 5.) We therefore have not considered those citations in deciding this appeal.

A. *The Parties*

Plaintiffs were wards at Stark between 2002 and 2004. Stark was the largest facility in the CYA system, with approximately 1,400 wards between the ages of 18 and 26.

Shelby was a YCC at Stark from 1995 to 2004. As a YCC, Shelby was a peace officer who worked with 10 to 15 wards individually and in small group counseling sessions. He was responsible for preparing parole reports, documenting wards' behavior, and ensuring that wards were enrolled in school and had jobs. A YCC also provided basic supervision of the living units. There were approximately 150 YCC's employed at Stark. As a peace officer, Shelby had legal rights under the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.) and as a member of the California Correctional Peace Officers Association; those rights limited supervisors' abilities to take disciplinary actions against Shelby.

6

Harper was appointed director of the CYA in May 2000 and held that position until December 2003. As director, he managed overall issues for the approximately 5,400-employee organization and oversaw its numerous youth facilities, including Stark. He had the authority to terminate a CYA employee when appropriate. The ward grievance system was also under Harper's supervision as director.

Ruiz was the superintendent of Stark from April 1999 until he retired in June 2004. As superintendent, he supervised all Stark employees and oversaw educational instruction; criminal rehabilitation services; security; medical, dental, and mental health clinics; parole case work services; food service; administrative services; and plant operations.

B. *Shelby's Conduct Toward Plaintiffs*

　　1. Ruelas

Ruelas testified that he was not assigned to Shelby's unit when he was a ward at Stark, but Shelby offered to put him on a cleaning unit. Ruelas testified about several incidents involving Shelby. One incident occurred when he was cleaning the halls. Shelby pointed to Ruelas's genitalia and said: "What are you working with? You know what I want." Ruelas pretended he did not know what Shelby was talking about. Once, in the showers, Shelby approached Ruelas and again said he "wanted to see what [Ruelas] was working with." Ruelas backed away. Shelby said that Ruelas was "lagging," and that Ruelas "knew what [Shelby] wanted." Another time, Shelby asked Ruelas to help him with case work. He took Ruelas into the "senior's office" and closed

7

the door.  Shelby started touching Ruelas's genital area and orally copulated Ruelas.  Ruelas did not fight back because he was scared.  A few days later, Shelby again took Ruelas into the senior's office and said he would allow Ruelas to make a personal telephone call.  Once in the office, Shelby asked Ruelas to start masturbating.  Shelby then knelt down and orally copulated Ruelas.

Similar conduct occurred about 15 to 20 times.  Ruelas repeatedly told Shelby "no," but Shelby did not respond.  When Ruelas tried to stop Shelby, Shelby said, "You don't know what I can do," which Ruelas interpreted as a threat.

Around October 2003, Ruelas made attempts to avoid having sex with Shelby.  Shortly thereafter, Ruelas was attacked by two other wards.  Another Stark YCC, Terrance Parker, was present when Ruelas was attacked.  Parker testified:  "Shelby open[ed] the door, the day room door and those wards came in and began to assault Ruelas."  Shelby did not attempt to intervene or stop the assault.  It appeared to Parker as if "Shelby intentionally opened the door . . . so that Ruelas could be assaulted."  After a period of time, the abuse escalated.  Ruelas testified that Shelby would have Ruelas penetrate Shelby, while Shelby masterbated.

2.  Espinoza

Espinoza testified that Shelby gave him a television, and asked Espinoza "to show him some," which Espinoza understood to mean "show [Shelby] something sexual."  Next, a ward brought Espinoza a pornographic magazine in his cell and told him to "get

8

ready" because Shelby was going to do a walk through. Espinoza covered his window and did not say anything when Shelby knocked on the door; Shelby left.

The next incident involved Espinoza asking Shelby for an adaptor for his television. Shelby brought him into the senior's office and said he would not let Espinoza have the adaptor until Shelby had "seen something." Espinoza pulled his pants down quickly and showed Shelby his penis; Shelby then gave him the adaptor. Another time, Shelby asked Espinoza to help him in the parole agent's office. Once in the office, Shelby knelt down, pulled Espinoza's pants down, and orally copulated Espinoza. Espinoza said he wanted to go back to his cell, and Shelby told him not to make a big deal about it.

3. Miranda

Miranda testified that Shelby demanded sexual favors from him, fondled his genitals, and orally copulated him. The incidents took place in closed offices. Shelby offered Miranda cigarettes and extra time out of his cell in exchange for sex.

4. Mendoza

Mendoza testified that Shelby orally copulated him several times from late 2003 through February 2004, and the only reason it stopped was because "Shelby was removed from the facility."

5. Other Evidence of Shelby's Conduct

James Castillo, a chaplain at Stark, testified that in February 2004, a ward came to him "kind of angry saying he just doesn't like what's going on up in the company . . .

9

referring to Shelby." Between February and March 2004, at least three different wards had contacted Chaplain Castillo regarding sexual abuse by Shelby. Chaplain Castillo then contacted Frank Cantino, a CYA's Office of Internal Affairs (IA) senior special agent, and reported what the wards had told him.

Dennis Moorman worked as a YCC at Stark until 2002; his employment overlapped that of Shelby for about a year. Moorman confronted Shelby on a "couple occasions" when he saw Shelby taking wards into the senior's office with the door closed. Moorman brought the matter to his supervisor's attention because he was concerned about safety issues. Moorman was required to conduct random cell checks, and he found contraband such as Walkmans, CD players, magazines, clothing, personal items, and cosmetics in the rooms of wards who were apparent favorites of Shelby. More than once, after Moorman had confiscated such contraband, he would later find that the confiscated items had been returned to the wards. Moorman also reported those events to his supervisor.

Moorman eventually requested to be transferred to another unit because he did not want to work with Shelby anymore; Moorman thought there was something inappropriate going on, and he had a safety concern about Shelby's well-being. Moorman had seen condoms in the trash of the senior's office. A "couple of times," wards approached Moorman and told him that Shelby was being inappropriate with wards or had some sort of a relationship with wards; however, Moorman did not recall that they ever told him

10

they had sexual contact with Shelby. Moorman heard from "a couple wards" that they would receive "presents" if they exposed themselves to Shelby.

Patrick Barber worked as a YCC at Stark from 1998 to 2009. He worked directly with Shelby for eight or nine months in 1999. During that time, he observed activities and behavior with wards that he believed were inappropriate. Once, when the whole institution was on lockdown, Shelby spent an hour to an hour and a half with a ward in the senior's office with the door closed. Barber testified that Shelby went into the senior's office, with a ward, with the door closed, "on a regular and ongoing basis," about twice a week. When Shelby walked wards into the room, Barber saw staff "mimicking or gesturing with a sexual connotation, typically associated with oral copulation." Barber never reported his observations to his supervisors because he felt he "would be retaliated against."

A former coworker of Shelby testified that she had occasionally seen Shelby go into the senior's office with wards and close the door, although doors were supposed to be left open for safety reasons.

Alvin Cohn, plaintiffs' expert on juvenile institution administration, testified that it was relatively rare for wards to complain of homosexual behavior on the part of staff. He explained that "juveniles are really intimidated in an institution. They're frightened. In the case of sexual behavior, homosexual behavior, they're embarrassed. [¶] So it's not uncommon when something like this does occur they would hold that information and [not] report it . . . because they don't want to be accused of being gay, especially if

11

they're not gay." He concluded "that Mr. Ruiz' performance was grossly inadequate and left a great deal to be desired in terms of what one would expect of a superintendent of a major institution." When asked if he had seen anything in the documents he had reviewed indicating Ruiz believed Shelby was a substantial risk to sexually assaulting wards, Cohn responded that he believed Ruiz "should have been concerned for the health, welfare and safety of the wards and should have taken more direct action to remove Mr. Shelby from contact with the wards until a complete investigation and everything put together from all of the complaints and allegations demonstrated what I believe to be a conclusion." Cohn stated that Ruiz had been "[s]omewhere between negligent and indifferent."

C. *Investigation of Ward Grievances*

The CYA and Stark had a grievance system through which a ward could complain of staff misconduct. In addition, a ward could send a confidential letter to the superintendent or director, or could call or write to the Office of the Inspector General (OIG) or the ombudsman.

When a ward filed a grievance about staff misconduct, the superintendent or his designee would evaluate the allegations to determine whether the facts alleged, if true, would support taking adverse action against the employee. If the grievance contained insufficient facts to support adverse action, the grievance would be rejected, and the ward would be informed of the right to file a new grievance seeking other relief. If additional facts were needed, a preliminary inquiry would be conducted, typically by a senior

manager at the facility who was not in the line of supervision of the employee under investigation. The superintendent or his designee would then either sustain the grievance, deny the grievance, or order a formal investigation by the CYA's IA office.

IA was an independent department of the CYA with the responsibility of investigating allegations of misconduct, and was headed by an assistant director who reported only to the director. IA investigators were not under the authority of superintendents. Thus, Ruiz had no role in the management of IA and was barred from having any influence on its operations and investigations.

Ruiz and Harper testified that the terms "inquiry" and "investigation" were often used interchangeably. However, an inquiry was less formal and was "solely designed to gather additional facts to make a further decision whether an investigation should be completed or whether there was sufficient facts available that the superintendent could make a decision" on whether the grievance had merit. IA became involved when a formal investigation took place. Harper testified that an inquiry could simply be closed with a letter by the superintendent, and more evidence was gathered during an investigation. Harper testified that not "all" IA investigations were brought to his attention, that "it would depend on whether the investigative head thought [he] should see it."

The OIG was an independent auditor of the California youth and adult correctional systems. The OIG would inspect a facility, prepare a report, and make recommendations.

The OIG visited Stark in mid-2000 to review its operations, and produced a management review audit report, dated October 2000, setting forth its findings.

Among other things, the report criticized aspects of the grievance system at Stark and the CYA investigative process. The report stated: "The investigative process does not ensure that allegations of staff misconduct are promptly and properly investigated. In addition, management actions relative to investigations that have been undertaken appear to be questionable. The facility's investigation log does not properly track investigation casework and investigations are not always completed in a timely manner. There is a lack of criteria clearly differentiating Level I and Level II investigations. Investigations are not always completed properly, and some are closed inappropriately. [Stark] also has no written policies and procedures governing its investigative process."

With respect to deficiencies in the ward grievance process, the report stated: "A number of grievances involving allegations of staff misconduct or staff assaults on wards have received little or no attention from [Stark] staff."

The OIG then produced a follow-up audit report in July 2002. Harper concluded, based on the follow-up report, that Stark "had made some significant progress in some of the areas that the OIG had pointed out." The follow-up report stated that the previous backlog had been eliminated, but that there were still "24 open staff action grievances more than 30 days old."

Harper testified that he did not have any concerns about the condition of the operations at Stark based on the management audit report and did not, therefore, develop any substantial concerns about Ruiz's management techniques, practices, or acts.

D. *Investigations and Ward Grievances Concerning Shelby Before 2004*

1. The 1999 Westlund Investigation

In 1999, IA investigator Daniel Westlund conducted an investigation of alleged misconduct by Shelby. The investigation concerned several allegations. First, that ward Matthew Beck had reported that he had seen Shelby performing oral copulation on ward Edward Rivera in Rivera's cell. Second, that Shelby had improperly left his post to speak to Rivera about YCC Gentry, and that Shelby had made "untrue, slanderous statements" to Rivera about Gentry. Third, that Shelby had allowed a ward to assist him in filing confidential ward files. And, finally, that Shelby had telephoned the shop where Rivera was assigned to work, falsely identified himself as YCC Thomas, and requested to speak to Rivera.

In conducting the investigation, Westlund interviewed ward Ricardo Tovar. Tovar alleged that sometime before May 1999, Shelby found contraband in Tovar's possession. Shelby told Tovar that he would not report him if Tovar allowed Shelby to orally copulate him. A maintenance worker at Stark told Westlund that after a discussion he had with Tovar, "he got the impression an event of a sexual nature had taken place between Shelby and Tovar."

15

Westlund recommended that all charges against Shelby be sustained. Ruiz testified he did not specifically remember Westlund's report, but his job included reviewing investigative reports and making discipline recommendations. He did not believe he had seen the exhibits to the report. Ruiz testified that he had recommended Shelby's termination.

The matter went to CYA's legal department, which eliminated Beck's accusation because Beck could not pin down the date of the alleged oral copulation of Rivera. The legal department also eliminated the charge of allowing a ward access to confidential files. The CYA director or his designee would ultimately decide whether to sustain the charges and what discipline to impose. Based on the remaining charges, the then-director's designee reduced Shelby's discipline from the originally recommended termination to a letter of reprimand.

At the time of Westlund's report of the 1999 allegations against Shelby, Harper was not yet employed by CYA, and he had not received Westlund's report.

(a) **The Perez Accusations**

In October 1999, ward Jason Perez assaulted Shelby and was charged for the assault through Stark's disciplinary system. An investigation was conducted as part of the usual process when a ward was charged with misconduct. Perez asserted that Shelby had "touched him in a sexual manner on or around his buttocks while escorting him back to a holding room." Perez assaulted Shelby after Shelby stepped into a holding room to

16

provide backup. The other officer present did not see Shelby touch Perez. The investigator found Perez's allegation not credible.

As discussed at more length, *post*, the OIG recommended in its October 3, 2000, report that "each allegation" against Shelby should be reinvestigated. Ruiz testified, however, that an investigation into the allegations raised by Perez had in fact been conducted.

The matter was assigned to Kevin Ide of IA, who submitted a report in March 2001. Ide reported that Perez admitted he had attacked Shelby because Shelby had touched his buttocks and had made a sexual comment. Perez told the investigator he had "been playing with Shelby with sexual comment[s]" the day before the incident. During the investigation, Shelby denied he had any communication or contact with Perez before the attack. However, three other wards stated they had heard conversations of a sexual nature between Shelby and Perez. One ward reported hearing, the day before the incident, that Shelby had said Perez "had a nice, quote, ass, end quote." Lieutenant Lefall, who witnessed the assault, stated he had been present to serve Perez with notice of a disciplinary hearing. Lefall stated that he had never seen Shelby put his hands on Perez; he did not remember seeing Shelby anywhere near Perez before the attack occurred; and there had been no exchange of words between Shelby and Perez before the attack.

17

In June 2001, formal notice went out that Perez's charges regarding improper touching were not sustained. Harper knew that the matter had been reinvestigated and the charges had not been sustained.

### (b) The Guerrero-Valles Grievance

In November 1999, ward Daniel Guerrero-Valles[2] alleged that another ward had broken his jaw by striking him in the face after football practice the previous month. He claimed Shelby had set him up to be injured because he had told Shelby he heard Shelby was providing sexual favors for other wards, and he wanted a different counselor.

After a preliminary investigation, Ruiz then ordered an IA investigation. On the form requesting the IA investigation, Ruiz did not mention the sexual communication, but only the broken jaw. Westlund was assigned the investigation. Westlund concluded that the allegation was not sustained. Ruiz testified he concurred with Westlund's conclusions, and he did not think Shelby "was an out of the ordinary risk of [committing] sexual misconduct against wards."

The OIG report of October 3, 2000, as discussed *post*, listed concerns about the investigation, specifically, (1) that Guerrero-Valles had not been questioned about the issue of sexual favors, which he had raised; (2) that Shelby had not been questioned about Guerrero-Valles's allegation; and (3) that the ward who had injured Guerrero-Valles had not been interviewed adequately.

---

[2] The ward's name also appears in the record as Guerrerovalles.

18

Harper was not the director when the initial Guerrero-Valles investigation took place. Harper had the matter reinvestigated, and he knew the charges had again not been sustained.

2. *The October 3, 2000, OIG Report*

On October 3, 2000, the OIG provided a report to Harper criticizing CYA's handling of Beck's and Rivera's allegations and subsequent investigation, as well as the investigations into the complaints of Tovar, Perez, and Guerrero-Valles.

The report stated that Perez had alleged that in October 1999, Shelby had provoked an assault "by inappropriately touching him in a sexual manner," and that despite Perez's reports to Stark staff, "no follow up action ha[d] been taken." The report stated: "Based on its review of ward Perez's allegations and the history of Shelby's past behavior, the [OIG] believes that action should have been taken to fully investigate Perez's grievance and disciplinary appeal issues involving possible inappropriate sexual misconduct by Shelby."

The report also discussed ward Tovar's allegation that Shelby had propositioned him for oral copulation in exchange for not reporting Tovar's possession of contraband; that allegation had supported the 1999 charge against Shelby for immoral sexual behavior, and Westlund's investigation had led to that charge being sustained. The OIG identified several concerns about the handling of the matter, including that the basis for eliminating the charge of immoral sexual behavior was questionable. The OIG noted that Tovar's allegation had not been fully pursued during the investigation and had not been

19

considered by the CYA legal office. The report stated: "Had Tovar's allegation been pursued more persistently, it is possible that the department could have more narrowly defined the time period when Shelby allegedly propositioned Tovar for sexual favors." The report further noted that "Shelby's sexual misconduct involving ward Tovar was amended out of the charges without explanation. Had the reason been insufficient evidence, there was no indication that [Stark] was asked to conduct further investigation to rectify such deficiencies."

The OIG report also listed concerns about the investigation of Guerrero-Valles's allegations, including that "Ward Guerrero[-V]alles was not questioned regarding the issue of 'sexual favors' that he raised in the private conversation with Shelby. Since this was the alleged motive for Shelby to 'set up' Guerrero[-V]alles, it was important to question Guerrero[-V]alles as to the source of the information and how Shelby responded to the issue." In addition, "Shelby was not questioned regarding Guerrero[-V]alles's allegation that Shelby performed sexual favors for wards. The investigation should have determined if Shelby was already aware of such a rumor and, if so, what he did about it."

The report concluded: "The [OIG] believes that a criminal investigation would have provided the [CYA] with more flexibility in gathering evidence of potential misconduct. Due to the number of sexual misconduct complaints on record[] for Shelby, the department had a duty to conduct a thorough and proper investigation to make that determination. That decision should have been pursued early in the investigative process with the involvement of the internal affairs unit and its chief of investigations." The OIG

20

recommended an additional IA investigation of Perez's and Guerrero-Valles's allegations, among other things.

The report recommended:  "The director of the [CYA] should review and revise the department procedures to ensure that complaints of staff misconduct are promptly and thoroughly investigated and that the results of investigations are addressed promptly and responsibly.  A system should be developed to closely monitor cases from the initiation of the investigation through final disposition.  The statutory time limit for various offenses should be considered and incorporated into this process."

The OIG further recommended:  "The director of the [CYA] should develop a departmental policy that clearly addresses how allegations of potential criminal conduct should be pursued.  This policy should focus on early review of requests by parole, institutions, and camps to open personnel complaint investigations to ensure proper screening of these cases for assignment to the appropriate investigative unit."

Harper testified that he had received the October 3, 2000, OIG report, but that he did not recall if he had received the attachments to that report.  After he received the report, he asked Ruiz to set up a meeting so he could meet Shelby and "get some idea of what he looked like, and do that in an inconspicuous way."  Harper introduced himself to a group of several employees, including Shelby.

Also, after he received the report, Harper directed IA to conduct a thorough investigation of the Perez incident.  The conclusion of that investigation was that Perez's allegation was unsubstantiated.  An IA investigation of Guerrero-Valles's allegation was

21

also reopened, and the conclusion was the allegation was unsubstantiated. Harper never heard any criticism about the results or process of those reinvestigations. Harper testified that he did not ever conclude or believe, as a result of the reinvestigations, that Shelby "constituted an out of the ordinary risk" of committing "forced sexual conduct" with wards.

Ruiz did not recall reviewing the October 3, 2000, OIG report regarding Shelby's conduct. He testified that reports or investigations from the OIG go directly to the director.

(a) **The Tanori Grievance**

On July 29, 2000, ward Armando Tanori filed a grievance alleging that Shelby had sexually harassed him more than once. Ruiz testified he "would have" reviewed the grievance in his job as superintendent of Stark, but he did not recall it. Ruiz's program administrator assigned the grievance for a preliminary inquiry. The inquiry was terminated after Tanori was paroled. The letter terminating the inquiry stated: "Ward paroled 8-11-00. Not enough time to complete inquiry. Matter extended until 8-27-00 [and] resolved."

Ruiz testified that the ward could have withdrawn the grievance or that it had been resolved to the ward's satisfaction. He stated: "All I can tell you is what the treatment team puts down here as resolved. I don't know what that means. But there was no investigation, if that's what you're asking." Ruiz further stated he did not know if he had "received the end of this inquiry or this grievance after it was signed off by [the program

22

administrator]." He agreed he should have reviewed the grievance, but he did not recall doing so. He did not know if the program administrator who signed off on the grievance had been aware of prior claims of sexual misconduct against Shelby, but acknowledged, "[t]hey should be aware."

Harper did not recall whether he had seen Tanori's grievance, and a grievance that was resolved at the institutional level would not have been sent to the director. Harper did not know if the OIG had ever recommended further investigation of Tanori's grievance, although he believed the OIG had been critical of the handling of that grievance.

(b) **The Delgado Grievance**

On April 1, 2002, ward Tomas Delgado wrote Ruiz a letter stating that Shelby had approached him "in a sexual way." The letter stated that Shelby had sent another ward to tell Delgado that if Delgado wrote up a grievance on Shelby, Shelby was "going to 'f--- [him] up.'" The letter continued: "Mr. Shelby is known for bringing contraband for his workers or what they call his mission boys. Mr. Shelby came at me in a sexual way because on 3-30-02, I was showering in the holding room area and he was staring at me. When I looked up and I said, 'what's up?' he said, '[you're] packing, I see.'" Delgado further wrote that Shelby told him that "if I let [Shelby] give me oral that I wouldn't have nothing to worry about anything financially [*sic*]."

Ruiz testified he did not recall the letter because he had received hundreds of letters and dozens of grievances. Ruiz assigned Delgado's grievance for inquiry. Ruiz

did not know if the investigator had been aware of prior grievances against Shelby. After receiving the investigator's report, Ruiz did not believe the evidence supported Delgado's accusations, and he did not believe there was an "increased risk" of Shelby committing "sexual misconduct with wards relative to . . . other staff members."

Harper did not recall knowing about Delgado's accusation. He did not know in April 2002 that another ward had come forward claiming Shelby wanted to orally copulate him. Harper agreed that the statements in Delgado's grievance "should have warranted an investigation."

### (c) **The Walker Grievance**

In March 2003, ward Tyrone Walker filed a grievance stating that Shelby had verbally and sexually harassed him, as well as sexually assaulted him. Harper assigned the matter to IA. In a memo from IA to Harper, it was reported that Walker had claimed Shelby was going to handcuff him and take him from a holding room to his cell alone, rather than with another staff member. Shelby told Walker, "I can handle you myself," which Walker interpreted as a sexual comment. Shelby also brushed against Walker and grabbed Walker's buttock. Shelby reported, however, that Walker had assaulted him when Shelby was escorting him to his cell.

After the inquiry was completed, an IA special agent sent Harper a memo recommending that no further investigation be conducted because there were no other witnesses and no corroborating evidence. Harper agreed that Shelby's failure to follow

24

security procedures by attempting to escort a ward by himself should have been addressed by Stark's management.

### (d) **The Galustian Incident**

In June 2003, Shelby was observed on security cameras leaving a bag outside the cell of ward Ruben Galustian. After leaving the bag, Shelby then opened the door so Galustian could bring the bag into his cell. Shelby admitted "placing a package (plastic bag) containing a 'bunt-cake' and 'candies' at the outside of [Galustian's] door."

Shelby's conduct violated Stark rules against bringing items into the institution, and Ruiz ordered an IA investigation. Based on Ruiz's recommendation, Shelby received a five-day suspension for violating the rules. Harper did not know about the incident.

### (e) **The Johnson Grievance**

In October 2003, ward Paul Johnson filed a grievance alleging that Shelby was harassing him and was treating him "unequally" by telling other wards not to talk to him. Johnson further alleged that he had "received information from several wards that (YCC) Mr. James Shelby ha[d] offered sexual advances to them for job opportunities and material goods from the community that are not allowed into the facility, and is considered 'contraband' according to policy, if they engaged in any sexual activity." Johnson continued: "One of these wards reported to me that he would occasionally expose[] his penis and at the same time masturbate[e] it when Mr. Shelby conducts his bank checks while he's in his room. The ward reported that Mr. Shelby would stop at his door and star[e] at him when [he] does this sexual act. Moreover, this ward reported to

25

me that Mr. Shelby would write him a note stating that he will be coming down the bank and wants to see his penis." The ward "furthermore reported to [Johnson] that Mr. Shelby will always offer sexual advances to him and will either reject Mr. Shelby's request or lead him on so that he can manipulate Mr. Shelby for more goods and juice." Johnson identified the ward as "Espinoza." Johnson's grievance further stated: "Ward Mendoza reported to me that Mr. Shelby offered sexual advances to him, gave him goods, and made him a company worker. Ward Mendoza reported to me that he did not . . . show any of his [private] parts to Mr. Shelby and rejected all of his sexual offerings . . . ."

Ruiz denied Johnson's grievance on the ground it could not be classified as a staff action grievance and because it was based on hearsay. It was never investigated. Ruiz did not tell Harper about the grievance, and Harper denied knowing about it.

E. *Ward Accusations Against Shelby in February 2004 and Subsequent Investigations*

On February 18, 2004, a group of wards at Stark, including Ruelas, Miranda, and Espinoza, gave statements regarding a joint investigation by IA and the Chino Police Department, and Shelby was placed on paid administrative leave.[3] Frank Cantino, an IA agent, and Jack Whitworth, a Chino police detective, conducted the investigation. Among other things, the wards accused Shelby of using various inducements to permit him to perform oral sex on each of them between September 2002 and February 2004.

---

[3] Shelby subsequently permanently retired on stress disability.

26

From March 2005 through November 2006, a criminal investigation of Shelby was conducted by IA special agent Frank Starmer. Starmer took over the Shelby investigation from agent Cantino.

After each investigation, the district attorney declined to prosecute the matter because of credibility problems with the accusers.

Over objections, the trial court allowed Cantino to testify about his interviews with wards "as possible notice to Ruiz." Cantino testified that ward Miguel Canas reported that in exchange for letting Shelby perform oral sex on him, Canas was provided with a Walkman and a television set. Ward Luis Salcido reported sexual acts consistent with those reported by other wards, "[i]n terms of the acts performed and the location of the acts." The acts occurred between December 2003 and February 2004. Ward Octavio Navarette reported being a victim of a sexual act by Shelby. Ward Steven Ortiz reported being "subject to [Shelby's] modus operandi."

As recounted, *ante*, ward Tovar reported, during Westlund's investigation, that Shelby caught him with contraband. Shelby indicated he would not write Tovar up, but stated, "[y]ou're going to owe me." Shelby later said he would orally copulate Tovar. Tovar told Westlund that Shelby had never touched him and had never brought up the topic again.

At trial, Tovar's videotaped deposition was introduced. In his deposition, Tovar testified that when wards came out of the shower, Shelby would "smack us on the butt."

27

Shelby had done that to Tovar about 15 times. Shelby made comments toward Tovar and other wards, such as "Wow, look at his package," when they were in the shower.

Once when contraband was found under Tovar's bed, Shelby told him he had a "write-up coming"; he could "work it off," and he would find out the next day what Shelby "meant." The next day after a group meeting, Shelby took Tovar into an enclosed office and told him to pull his pants down and to let Shelby "suck [his] dick." Tovar let Shelby do so because he feared that if he did not, his sentence would be extended. Tovar ejaculated, and Shelby put the semen in a napkin and threw it in the trash. Shelby told Tovar "not to say a word" about it, which Tovar interpreted as a threat. Shelby said not to worry about the write-up, that he would "rip it," and then Shelby ripped some paper. Tovar did not engage in any other sexual acts with Shelby, but Shelby stared at him during hallway routine checks and told him to pull his pants down and "pull it out." Tovar exposed himself to Shelby about three times, and he saw Shelby asking other wards to expose themselves "a lot of times." Shelby sent him notes telling him not to say a word about what had happened. Tovar told a cook, a janitor, and a maintenance worker about what had happened. They all told him to go to the staff, but Tovar did not feel he could trust the staff. He did not tell anyone else because he was embarrassed. He did not remember if he had told Westlund during the investigation, but he had tried to be as accurate as he could during his interview. Tovar told Starmer and another agent that Shelby had orally copulated him.

Douglas Gerard testified that while he had been a ward at Stark, Shelby would stare at him in the shower in a way that was inappropriate. Gerard testified that in one incident, he asked Shelby "for a phone call," and Shelby let Gerard use the telephone in the senior's office. After Gerard made the call, Shelby said something like, "[t]hat's not for free." Shelby then grabbed Gerard's penis, started stroking him, and performed oral sex on Gerard. After that incident, whenever Gerard helped Shelby by carrying files or other items, Shelby would touch him and make comments, but there were no other instances of oral sex. Another encounter involved Shelby taking a television set away from Gerard. Gerard testified that the only way to get it returned was by "flirting" with Shelby and letting Shelby grab him. Twice, Shelby brought Gerard packages containing cigarettes and marijuana, which Shelby had received from Gerard's friends outside the institution. Another time, while in the senior's office, Shelby put a condom on the desk and asked Gerard to engage in anal sex with him. Gerard refused and left the office. Gerard testified that he did not remember telling officers that he did not have a sexual relationship with Shelby. Gerard stated: "I might have told them. I just don't remember if I did or didn't. . . . [I]t's an embarrassing thing to talk about."

Ortiz, who had previously reported to Cantino during the joint IA/Chino Police Department investigation that Shelby had orally copulated him in an office, testified at trial that he had made up the story because Shelby was strict, and Ortiz did not want Shelby to return to Stark.

29

Cantino testified that in response to the nature of the investigation, Ruiz stated either that "Hispanics don't engage in homosexual activity with [B]lacks" or that Ruiz "did not believe Hispanics engaged in homosexual behavior."

F. *Verdicts and Judgments*

The jury entered special verdicts finding that Shelby masturbated, orally copulated, or engaged in anal sex or other severe sexual conduct with each plaintiff; that no plaintiff had consented to such acts; and that Shelby's conduct was a substantial factor in causing harm to each plaintiff.

As to claims against Harper, the jury entered special verdicts finding that Espinoza, Miranda, and Ruelas were imprisoned under conditions that exposed each of them to a substantial risk of serious harm and/or sexual abuse, and Harper knew of such risk and disregarded the risk by failing to take reasonable measures to correct it. The jury found that Harper's conduct was a substantial factor in the harm caused to Espinoza, Miranda, and Ruelas.

As to claims against Ruiz, the jury entered special verdicts finding that plaintiffs were imprisoned under conditions that exposed each of them to a substantial risk of being seriously harmed and/or sexually abused, and Ruiz knew of such risk and disregarded it by failing to take reasonable measures to correct it. The jury also found that Ruiz's conduct was a substantial factor in the harm caused to plaintiffs.

The jury awarded damages of $12,000 to Espinoza, $250,000 to Miranda, $655,896 to Ruelas, and $160,000 to Mendoza. The jury found that the conduct of Shelby, Harper, and Ruiz had been proven by clear and convincing evidence.

The parties stipulated to punitive damages, as follows:

Against Shelby: $46,309.67 (Ruelas); $28,023.67 (Miranda); $666.66 (Espinoza); and $25,000 (Mendoza).

Against Ruiz: $21,384.66 (Ruelas); $12,948.68 (Miranda); $666.66 (Espinoza); and $15,000 (Mendoza).

Against Harper: $30,734.67 (Ruelas); $18,598.67 (Miranda); and $666.66 (Espinoza).

The trial court awarded costs and attorney fees to counsel for Ruelas, Miranda, and Espinoza against Shelby, Harper, and Ruiz jointly and severally in amounts totaling more than $6 million. The fee awards to Mendoza are not at issue in this appeal.

Additional facts are set forth in the discussion of the issues to which they are relevant.

### III.  DISCUSSION

A. *Exhaustion of Administrative Remedies*

Shelby and Ruiz contend the trial court erred in finding that Mendoza had exhausted his administrative remedies.

31

1. <u>Additional Background</u>

Mendoza filed his initial complaint in February 2005, while he was still incarcerated at Stark. Mendoza proceeded to trial on claims against Ruiz under title 42 United States Code section 1983 and against Shelby under state law (Civ. Code, § 52.4, negligence) for sexually assaulting him and molesting him while he was a ward at Stark.

Mendoza concedes he did not file a written grievance before filing suit, although he knew how to do so. When the sexual conduct began, Mendoza did not complain to anyone because he feared retaliation from other wards or staff for filing a complaint based on sexual abuse, and because he did not know of anyone he could trust. After he learned Shelby had been removed from Stark and that other wards had already complained about Shelby, Mendoza testified that he felt safe and did not feel the need to complain. Once Mendoza heard rumors that Shelby might return, he wrote two letters to Chaplain Castillo and spoke to him in person about the molestation. Mendoza went to the chaplain because he heard that other wards had spoken to the chaplain, and that other wards had been interviewed about Shelby. Chaplain Castillo in turn reported the incidents to IA agent Cantino.

Ruiz moved for summary adjudication on the ground Mendoza had failed to exhaust his administrative remedies. The trial court initially granted that motion, concluding that Mendoza had failed to file a written grievance under the procedures available at Stark.

Shelby moved for summary judgment on the same ground. The trial court held that while Mendoza's informal report to the chaplain was insufficient to create any exception to the exhaustion requirement with respect to federal claims, it was sufficient with respect to the state law claims against Shelby. The court also found a "triable issue with regard to whether he could have even filed a proper grievance based on the circumstances at Stark at that time." The court thus denied Shelby's motion for summary judgment.

Harper and Ruiz moved for summary adjudication of the claims of Ruelas, Espinoza, and Miranda on the ground they had failed to exhaust administrative remedies. At the hearing on the motion, defense expert Edward Izaguirre, a wards' rights coordinator at Stark from August 2003 to December 2005, testified that the "Ward's Rights Handbook" (the handbook), which was given to each ward upon entry into the facility, was one of the documents containing a description of Stark's grievance process. The handbook provides: "The Ward Grievance Procedure is a process you may use when you have a complaint or problem with any Youth Authority policy, rule or practice, or with any behavior or action directed toward you by staff or other wards. [¶] If you have a complaint about a policy or staff member, talk it over with staff first. In most cases, they can help you work it out. Try to find an answer to your problem. You are not required to talk about it before filing a grievance, but you are encouraged to do so."

Izaguirre detailed the steps through which a staff action grievance was processed. If a staff action grievance was denied, "[t]he appeal process was the regular grievance

33

system." Izaguirre testified that at Stark, "we recognize what they call a zero level. A zero level is called the informal resolution. The level one is the panel level. That's where you go to panel and you have the ward who is filing the grievance, and he presents his case to the panel, and then, it is either accepted as the grievance or it's denied. If it's denied, then it goes up to the appeals, which is the next level, which is the level two." Izaguirre clarified that the informal process took place "after the grievance has been filed," and in the informal process, "[t]he grievance writer and the senior youth counselor sit down and see if they can mediate it before it gets to the first level." He further testified that a grievance concerning sexual assault by a YCC would not be something that would be informally resolved. The appeal process for staff action grievances was not set forth in the handbook, but was described in the "Administrative Policy and Operations Manual." Izaguirre further stated that if a ward's staff action grievance was denied, "[t]he ward is advised that he could go through the regular grievance system as his appeal."

The trial court found: "First of all, I don't think *Wright* [*v. State of California* (2004) 122 Cal.App.4th 659 (*Wright*)] applies to the [CYA]. Second of all, Welfare and Institutions Code [section] 17666.5 [*sic*, see § 1766.5] just dictates a grievance system. Title 15, Division 4 Chapter One Article 5 lays out the grievance procedure and does not make it mandatory. [¶] And furthermore, the mandatory language in there has to do with the superintendent and regional administrative [remedies]. And furthermore, I don't

34

believe as outlined in there that this type of grievance even comes within the procedure. And it's my feeling that it probably just comes strictly under the Tort Claims Act."

Thereafter, Mendoza requested reinstatement of his claim against Ruiz based on the ground that he had exhausted available administrative remedies even though he had not filed a formal written grievance. He argued that his oral report of Shelby's abuse to Chaplain Castillo satisfied the local grievance process that encouraged wards to make oral reports before filing written grievances. He further contended that as a result of his oral report, Mendoza had obtained the relief he sought: He was protected from further abuse; his claims were investigated; and, thus, he had exhausted his administrative remedies. In support of his motion, Mendoza filed, among other things, excerpts from the deposition testimony of defendants' expert witness, Jay Aguas. Specifically, Aguas replied, "no," to the question, "Does a ward have to file a grievance if they are the victim of a criminal act by a staff member?" and "yes" to the question, "If . . . a ward is the victim of a criminal act by a staff member, may that ward seek assistance to address his victimization without utilizing the grievance system?"

The trial court reversed its previous order granting summary judgment and granted Mendoza's motion to reinstate his federal claim against Ruiz. The court held that Mendoza's oral complaint to the chaplain satisfied the exhaustion requirement and fulfilled the remedies available at Stark.

2.  Exhaustion Requirements Under Federal and State Law

Under the Prison Litigation Reform Act (PLRA), a prisoner must exhaust all available administrative remedies before bringing a title 42 United States Code section 1983 action.  Specifically, title 42 United States Code section 1997e(a) provides:  "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  In *Booth v. Churner* (2001) 532 U.S. 731, 733-741, the Supreme Court held that the PLRA requires a prisoner to complete a prison administrative process even when the prisoner seeks only money damages, and the available process does not provide for recovery of such damages.  (*Id.* at p. 734.)

The exhaustion requirement similarly applies to state law claims:  "Under both state and federal law, a prisoner must exhaust available administrative remedies before seeking judicial relief. . . .  The exhaustion requirement is jurisdictional:  a court cannot hear a case before a litigant exhausts administrative remedies."  (*Wright*, *supra*, 122 Cal.App.4th at pp. 664-665.)

Welfare and Institutions Code section 1766.5 provides for the establishment of a grievance system within the CYA:  "The director shall establish and maintain a fair, simple, and expeditious system for resolution of grievances of all persons committed to the Youth Authority regarding the substance or application of any written or unwritten policy, rule, regulation, or practice of the department or of an agent or contractor of the

department or any decision, behavior, or action by an employee, agent, contractor, or other person confined within the institutions or camps of the Youth Authority which is directed toward the grievant, other than matters involving individual discipline." The California Code of Regulations defines a grievance as "a complaint from a ward concerning: [¶] (1) The substance or application of any written or unwritten policy or practice of the Department, . . . or [¶] (2) [a]ny behavior or action directed toward a ward by staff or other wards." (Cal. Code Regs., tit. 15, § 4085, subd. (a)(1), (a)(2).) A ward may file a grievance concerning "[a]lleged employee misconduct, improper or inappropriate behavior, or failure of an employee to perform assigned duties." (Cal. Code Regs., tit. 15, § 4086, subd. (e).)

In *Wright*, the court affirmed the dismissal of a prisoner's action against the state, the department of corrections, and individual administrative and medical personnel for medical malpractice and failure to furnish medical care, holding that the prisoner had failed to exhaust available administrative remedies, even though money damages were unavailable in the administrative process. (*Wright*, *supra*, 122 Cal.App.4th at pp. 668-669.) The court rejected the prisoner's contention that substantial compliance (i.e., completion of two of four levels of review) was sufficient to exhaust administrative remedies. (*Id.* at p. 664.) The court explained that "[t]he exhaustion of [the] administrative remedies requirement furthers several important societal and governmental interests. These include bolstering administrative autonomy, mitigating damages, giving agencies [the] opportunity to make factual findings, encouraging settlement, filtering out

frivolous claims, fostering better prepared litigation, and promoting judicial economy. [Citations.]  In addition, the requirement ensures 'the use of administrative agency expertise and capability to order and monitor corrective measures . . . .' [Citation.]" (*Id.* at p. 666.)

       3.  <u>Exhaustion Requirements Apply to Wards at Stark</u>

      Mendoza argues that exhaustion requirements might not apply to wards in juvenile detention facilities.  We disagree.  By its terms, the PLRA applies to juvenile wards, as well as to adult prisoners:  "As used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law . . . ." (42 U.S.C. § 1997e(h).) Federal courts have held that the PLRA applies to juvenile detention facilities, as well as to prisons.  (See, e.g., *Christina A. v. Bloomberg* (8th Cir. 2003) 315 F.3d 990, 994-995; *Alexander S. v. Boyd* (4th Cir. 1997) 113 F.3d 1373, 1383-1385, abrogated on another ground by *Martin v. Hadix* (1999) 527 U.S. 343, 352.)

      Mendoza has cited no authority for the suggestion that wards in juvenile detention facilities are exempt from state law exhaustion requirements, and our own research has revealed none.  Moreover, the regulations applicable to grievances of adult prisoners (Cal. Code Regs., tit. 15, §§ 3084.1-3084.7) under consideration in *Wright* do not differ in any meaningful way from the regulations applicable to wards (Cal. Code Regs., tit. 15, § 4086 et seq.).  Thus, the reasoning and conclusions of the court in *Wright* are fully applicable to the case before us.

Finally, we note that Mendoza was not a minor when the sexual conduct occurred. Harper testified that all wards at Stark are between 18 and 26 years old.

4. <u>Neither an Oral Complaint Nor Participation in an IA Investigation Exhausted Administrative Remedies</u>

Mendoza argues that by making an oral complaint and by participating in the IA investigation of Shelby, he satisfied the exhaustion requirement. We disagree. Courts have held that participation in an IA investigation does not satisfy the PLRA exhaustion requirement. (*Pavey v. Conley* (7th Cir. 2011) 663 F.3d 899, 905-906.)

In *Pavey*, it was undisputed that the plaintiff did not file a grievance under the prison's grievance process, although he had complained to prison officials. (*Pavey v. Conley*, *supra*, 663 F.3d at p. 905.) The court held: "No plausible reading [of applicable procedures] even *hints* that if an inmate cannot write, [the plaintiff had a broken hand] he may abandon the requirement of filing a written form with the grievance specialist so long as he has told someone in the prison about his ailments. . . . When administrative procedures are clearly laid out, as in this case, an inmate must comply with them in order to exhaust his remedies. [Citations.]" (*Ibid.*) The court also rejected the argument that Pavey's participation in an IA investigation was sufficient to exhaust administrative remedies. The court explained that the PLRA "is concerned with the 'remedies' that have been made available to prisoners. An internal-affairs investigation may lead to disciplinary proceedings targeting the wayward employee but ordinarily does not offer a remedy to the prisoner who was on the receiving end of the employee's malfeasance.

[Citations.] [¶] And even if the internal-affairs investigation *could* result in some relief for the prisoner, the Supreme Court has rejected any suggestion that prisoners are permitted to pick and choose how to present their concerns to prison officials. 'The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules.' [Citations.] If a prisoner can be required to submit his grievance in the particular manner and within the precise period of time designated by the prison's administrative procedures, then he must also be required to present his grievance in the proper forum." (*Id*. at pp. 905-906; see *Panaro v. City of North Las Vegas* (9th Cir. 2005) 432 F.3d 949, 953-954 [rejecting the argument that participation in an internal affairs investigation constituted constructive exhaustion of administrative remedies]; *Thomas v. Woolum* (6th Cir. 2003) 337 F.3d 720, 734 ["In determining whether the inmate has exhausted his or her remedies, we . . . look to the inmate's grievance, not to other information compiled in other investigations"], abrogated on other grounds in *Woodford v. Ngo* (2006) 548 U.S. 81, 87.)

In *Macias v. Zenk* (2d Cir. 2007) 495 F.3d 37, the court held that an informal complaint did not satisfy the exhaustion requirement. The administrative remedy system at issue included three tiers: "The first tier requires the inmate to report informally the issue to the staff, the second tier requires the inmate to file a written remedy request with the Warden, and the third tier requires the inmate to file appeals with the appropriate

40

Regional Director and then with the General Counsel." (*Id.* at p. 42.) Thus, even when the available procedures include an informal report to staff, compliance with that step alone does not exhaust administrative remedies.

Mendoza further argues that Izaguirre's testimony established that there was a "zero level" procedure, under which a ward could report a problem orally, in addition to the formal grievance procedure at Stark. However, Izaguirre clarified in his testimony that the informal "zero level" procedure applied only *after* a ward had filed a written grievance; the procedure was not, as Mendoza argues, a substitute for filing a written grievance.

### (a) **The Futility Exception Does Not Apply**

#### (i) *Additional Background*

In the OIG July 2002 follow-up audit report, numerous problems with the ward grievance system were identified. The report stated that "fewer than half" of the prior recommendations to Stark management had been implemented, and that the ward grievance system had "not improved." Specifically, the report stated: "Problems with the ward grievance system continue. The institution does not investigate all ward grievances in a timely manner. The follow-up review found 24 open staff action grievances more than 30 days old, one of which dated back to August 2000." "Another seven staff action grievances, received from May through July 2001 were still outstanding as preliminary fact-finding investigations. Of the 44 outstanding regular grievances, 11 (25%) were more than 30 days old." The report further stated: "The

institution has not developed written policies and procedures for conducting internal affairs investigations. Moreover, the institution is not properly tracking investigative casework. Careful monitoring of individual investigations to ensure thoroughness, proper disposition, and prompt completion is not always accomplished."

(ii) *Analysis*

Mendoza argues that the exhaustion requirement does not apply when an effective administrative remedy is wholly lacking. He further argues that he was excused from filing a grievance because the evidence showed it would have been denied.

Federal courts have held that the futility exception to the exhaustion requirement does not apply in PLRA suits. (*Booth v. Churner*, *supra*, 532 U.S. at p. 741 fn. 6 [stating that the court would "not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"].)

Under state case law, the futility exception applies "only if the party invoking it can positively state that the administrative agency has declared what its ruling will be in a particular case." (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1313.) Mendoza has made no such showing. The OIG reports on which Mendoza relies were prepared in 2000 and 2002, before the conduct alleged in the current action. Mendoza also argues that Ruiz's treatment of ward Johnson's grievance indicates he would have denied any grievance raising similar allegations. However, the basis for the denial of Johnson's grievance was that it was based on hearsay. Mendoza has not established that if he had filed his own grievance, it would have been similarly dismissed.

42

(b) **No Exception for Victim of Criminal Act**

Finally, Mendoza argues that expert witness Aguas stated that a ward who was the victim of a criminal act did not have to use the formal grievance procedure. It goes without saying that a ward is not *required* to file a formal grievance when he is the victim of a criminal act: For whatever reasons, any ward may choose not to pursue such a matter further. However, that does not mean the ward who declines to file a grievance may later seek redress by filing a civil suit; rather, the law is clear that he may not do so unless he has completed the formal grievance process. (See *Wright*, *supra*, 122 Cal.App.4th at pp. 668-669.)

We conclude that the trial court erred in ruling Mendoza had exhausted his administrative remedies, and the judgments in his favor must be reversed.

B. *Disclosure of Evidence Under Evidence Code Section 1045*

Defendants argue that the trial court erred in disclosing evidence to plaintiffs in violation of Evidence Code section 1045 and admitting that evidence at trial.

1. Additional Background

During discovery, plaintiffs filed a *Pitchess*[4] motion under Evidence Code sections 1043 through 1045 for disclosure of records in Shelby's personnel file. The trial court granted the motion and ordered the production of information in that file going back to October 19, 1997. The trial court then conducted an in camera review of the file and

---

[4] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

43

ordered the release of documents, including Westlund's 1999 report of his investigation into the accusations against Shelby, the OIG's October 3, 2000, report discussing the Westlund report, as well as other matters relating to Shelby.

Specifically, the Westlund report and the October 3, 2000, OIG report contained references to the complaint made against Shelby in 1999 by ward Beck stating he had seen Shelby performing oral sex on ward Rivera in Rivera's cell. CYA records confirmed that the incident could have occurred only between July 1996 and January 1997, more than five years before Shelby's misconduct as to plaintiffs.

Defendants moved in limine to exclude from evidence the information concerning Beck's accusation against Shelby on the ground, among others, that disclosure and admission of such evidence violated Evidence Code section 1045, subdivision (b)(1), because it concerned conduct that had occurred more than five years before the conduct at issue in the current case. After conducting a hearing, the trial court granted the motion: "I'll exclude the Beck-Rivera portions of the file from evidence. And unless there's other ways of getting it in, I'll exclude reference to that in opening statement or any other purpose." However, the trial court later permitted use of such evidence throughout the trial, including allowing plaintiffs' counsel to question Ruiz regarding the allegations in Beck's complaint and to have Ruiz read an excerpt from the Westlund report to the jury.

(2) Discussion

Peace officers' personnel records are privileged and may not be disclosed except through statutory procedures. (Pen. Code, §§ 832.7, 832.8; Evid. Code, §§ 1043-1047;

44

*Pitchess v. Superior Court*, *supra*, 11 Cal.3d 531.)  Those procedures apply in both criminal and civil cases.  (*Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 390.)  Evidence Code section 1045 provides:  "(a)  Nothing in this article shall be construed to affect the right of access to records of complaints, or investigations of complaints, or discipline imposed as a result of those investigations, concerning an event or transaction in which the peace officer . . . participated, or which he or she perceived, and pertaining to the manner in which he or she performed his or her duties, provided that information is relevant to the subject matter involved in the pending litigation.

"(b)  In determining relevance, the court shall examine the information in chambers in conformity with [Evidence Code] Section 915, and shall exclude from disclosure:

"(1)  *Information consisting of complaints concerning conduct occurring more than five years before the event or transaction that is the subject of the litigation in aid of which discovery or disclosure is sought*."  (Italics added.)

The Legislature's purpose in enacting Evidence Code section 1045 was to protect peace officers' privacy interests.  (See, e.g., *Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1085.)  In enacting that section, the Legislature defined as irrelevant, and therefore exempt from disclosure, complaints about conduct that occurred more than five years before the events that form the basis of current litigation.

As to Shelby, the "conduct . . . that is the subject of the litigation," to which the prior complaints are relevant, began as to the present plaintiffs in mid-October 2002.  The

45

conduct underlying the Beck-Rivera complaint, which was discussed in the Westlund report and again in the OIG report, occurred sometime between July 1996 and January 1997. In that the conduct occurred more than five years before mid-October 2002, the court erred in admitting the evidence against Shelby. As to Harper and Ruiz, however, the Beck-Rivera complaint was admissible. The conduct "*that was the subject of the litigation*" regarding Harper and Ruiz was their deliberate indifference, or their "failure to protect" plaintiffs against a risk of injury with actual knowledge of the underlying facts. Thus, as to Ruiz, his "failure to protect" arguably began upon his review of the 1999 Westlund investigation; Harper's "failure to protect" arguably began upon his review of the 2000 OIG report. As such, the Beck-Rivera conduct which occurred between July 1996 and January 1997 was relevant to the defendants' failure to protect up through July 2001 (the fifth anniversary of the Beck-Rivera conduct).[5]

As such, the court did not err in allowing into evidence the Beck-Rivera complaint on the issue of notice relative to the theory of a "failure to protect."[6]

---

[5] We also note that the personnel records at issue are not those of Harper or Ruiz. While Shelby and his employer may claim the privilege, there does not appear to be any basis for Harper and Ruiz to assert a privilege over records that are not theirs. (*Abatti v. Superior Court* (2003) 112 Cal.App.4th 39, 57 ["Both the individual officer and the law enforcement agency are entitled to claim the confidential personnel records privilege of Penal Code section 832.7."].)

[6] See *Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 639 [in noncriminal matter where petitioner seeks personnel records of nonparty public safety officers, the court must balance the litigant's discovery interest against the officer's confidentiality interest].)

C. *Objections to Polygraph Evidence*

Defendants challenge the admission of polygraph evidence relating to the Beck-Rivera accusations. We agree that as to Shelby and Harper there was insufficient foundation to establish the reliability of the polygraph result for purposes of using said evidence for its truth in establishing Shelby's common plan. (*People v. Kelly* (1976) 17 Cal.3d 24.) We do not agree as to Ruiz. First, Evidence Code section 351.1 does not preclude the use of polygraph evidence in civil cases. (See *People v. Fields* (2009) 175 Cal.App.4th 1001, 1017 ["Evidence Code section 351.1 does not speak to the use of polygraph evidence in proceedings outside the context of criminal proceedings, and we have found no statutory or judicially created bar to a party offering polygraph evidence in civil proceedings."]; cf. *Arden v. State Bar* (1987) 43 Cal.3d 713, 723-724 [polygraph evidence could not be used in a disciplinary proceeding].) Second, while the polygraph result may not be submitted for its truth, it was clearly relevant and admissible as to defendant Ruiz.

In order to prove deliberate indifference under a "failure to protect" theory, plaintiffs had to demonstrate that Ruiz had actual knowledge of a substantial risk to plaintiffs. To show such knowledge plaintiffs needed to establish that Ruiz either directly investigated or was aware of the facts reported in investigations performed by others. As confirmed by Ruiz: (1) "polygraphs were an investigative tool used by the CYA at that time"; (2) Ruiz himself "recommended polygraphs on certain cases"; (3) while not "entirely accurate," he "saw some benefit in them . . . [¶] . . . with regards to

47

using them as a tool." As such, regardless of the reliability of a polygraph test, Ruiz used them and found them helpful in various investigations. And as clarified by Marc Gantt "the information that you obtain [from a polygraph] cannot be used as . . . the reason for any type of discipline. It's an investigative tool alone." The testimony was therefore admissible as to the nature of the investigations and the attempt to verify or confirm the underlying facts. It is probative on the issue of notice.

D. *Hearsay Objections to Statements from Investigative Reports*

Defendants contend the trial court erred in allowing into evidence prejudicial and irrelevant hearsay statements from investigative reports.

1. Additional Background

Defendants moved before trial to exclude various investigative reports on the grounds that such evidence was inadmissible hearsay, lacked validation, violated the secondary evidence rule, was inadmissible evidence of prior bad acts, and violated Evidence Code section 1280. The trial court granted the motions, but ruled that such evidence might be admissible for impeachment.

Over defense objections, the trial court later permitted Cantino to read excerpts from his report. Cantino testified that during his investigation, he had interviewed numerous people, with the majority of those people being wards.

During Ruiz's testimony, the trial court instructed the jury, as follows: "Certain evidence was admitted for a limited purpose. You may consider that evidence only for the limited purpose and not for any other purpose. [¶] You have heard testimony about

48

documents that contain allegations regarding defendant James Shelby that were made by wards other than the plaintiffs in this case. Testimony about documents which contain allegations made by witnesses who were not before the Court is hearsay. [¶] These hearsay statements are admitted into evidence for a limited purpose. You may only consider this testimony to determine whether defendants Harper and/or Ruiz had notice that defendant James Shelby was engaging in improper acts or [o]missions and for no other purpose. [¶] You may not consider this evidence for the purpose of determining whether defendant James Shelby did such acts with the plaintiffs before . . . this court."

In giving final instructions, the trial court stated: "We read this before, weeks ago, but I'm reading it again." The court then repeated the instruction, as set forth *ante*. The trial court further instructed the jury: "During the trial, I explained that certain evidence could be considered as to only one party. You may only consider that evidence as to any—you may not consider that evidence as to any other party. [¶] During the trial, I explained that certain evidence could be considered as to one or more parties, but not to every party. You may not consider that evidence as to any other party."

In argument to the jury, Shelby's attorney stated: "[Y]ou got a special instruction. I'm going to go through that with you on this hearsay issue because it's important. And this case is unusual in that a lot of hearsay evidence came into the case against Mr. Ruiz and Mr. Harper that isn't appropriate evidence against Mr. Shelby." Counsel then argued extensively about the hearsay evidence that could not be used against Shelby.

49

2. <u>Analysis</u>

Shelby's hearsay objection to the reading of ward statements in investigative reports is off the mark  because such statements were not admitted against him, and the trial court explicitly instructed the jury on that point.

The information that was made known to Harper and/or Ruiz was admissible over their hearsay objections because the statements were offered to show their notice or knowledge of the assertions wards had made, not whether those assertions were true. Because the allegations were not offered to prove their truth, they are not subject to the prohibition against hearsay.  (See, e.g., *Magnolia Square Homeowners Assn. v. Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049, 1057.)

E. *Secondary Evidence Objection*

Defendants contend the trial court abused its discretion in allowing Cantino to read excerpts from his report because the testimony violated the secondary evidence rule. Shelby argues that the trial court should have excluded Cantino's testimony about the contents of interviews because original tape recordings of the interviews were available.

Evidence Code section 1520 states:  "The content of a writing may be proved by an otherwise admissible original."  Evidence Code section 1521, subdivision (a)(2), provides that secondary evidence may not be used to prove the contents of a writing if admission of the evidence would be unfair.  A "writing" includes every means of recording tangible things, including tape or video recordings.  (Evid. Code, § 250; *People v. Panah* (2005) 35 Cal.4th 395, 475.)  In *Panah*, the court explained:  "The purpose of

50

the best evidence rule is 'to minimize the possibilities of misinterpretation of writings by requiring the production of the original writings themselves, if available.' [Citation.] Therefore, '[t]he best evidence rule applies only when the contents of a writing are at issue.' [Citation.] Conversely, '[u]nless the content is in issue the best evidence rule does not come into play.' [Citation.] Where no dispute exists regarding the accuracy of the evidence received in lieu of the original writing, any error in admitting such evidence is harmless." (*Ibid.*) Here, likewise, any error was harmless.

F. *Objection Under Evidence Code Sections 1101 and 352*

Shelby contends the trial court erred in admitting evidence of prior bad acts in violation of Evidence Code sections 1101 and 352.

1. Additional background

Shelby, joined by Harper and Ruiz, moved before trial to exclude evidence relating to other alleged prior bad acts under Evidence Code sections 1101 and 352. The trial court held it would rule on the motion at an Evidence Code section 402 hearing before plaintiffs introduced any such evidence. However, the trial court later permitted plaintiffs to introduce such evidence over defense objections and without holding an Evidence Code section 402 hearing. Shelby now challenges the admission of extensive evidence of prior bad acts on the ground such evidence did not qualify under the common plan exception to Evidence Code section 1101, and it was unduly prejudicial under Evidence Code section 352.

The challenged evidence included (1) the reports of four wards (Canas, Navarette, Ortiz, and Tovar) that Shelby had sex with them; (2) evidence that Shelby had searched a Web site known as "meetaninmate.com" on his home computer; (3) Starmer's conclusions that Shelby had a "modus operandi" for coercing male Latino wards into having sex with him, that Shelby engaged in a seduction pattern, and that Starmer believed the accusers; (4) the report of Chaplain Castillo that several wards had told him of other instances of Shelby's sexual misconduct; and (5) Shelby's own testimony that he was bisexual, engaged in sex with men, and his preference with men was to receive anal sex. Shelby also challenges, on the same grounds, the admission of evidence of a sexual encounter with a former ward, Douglas Gerard, and Gerard's testimony that Shelby had sexually harassed him when he was a ward.

2. Allegations of Other Wards

We first note that much of the evidence about which Shelby complains was not in fact admitted against him; the trial court instructed the jury that hearsay statements containing allegations from other wards against Shelby was admitted *only* to show notice as to Harper and Ruiz. We assume that the jury limited its consideration of such evidence as it was instructed to do. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803.)

With respect to the evidence that *was* admitted against Shelby, specifically, the trial testimony of Gerard and the deposition testimony of Tovar read at trial, Evidence Code section 1101, subdivision (b), allows admission of uncharged conduct "when

52

relevant to prove some fact (such as motive, . . . intent, preparation, [or] plan . . .) other than [the defendant's] disposition to commit such an act." In *People v. Ewoldt* (1994) 7 Cal.4th 380, the court explained: "[E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*Id.* at p. 403.)

Shelby contends the challenged evidence involving sexual contact with other wards "does not share sufficient features with the allegations to fall under the common plan exception," and that the allegations by other wards were not sufficiently similar to those of plaintiffs to admit them under the common plan exception to Evidence Code section 1101. In his statement of facts, which spans only six pages of his opening brief, despite an appellate record that fills over 100 volumes and approximately 9,000 pages of reporter's transcript, Shelby gives scant details of the conduct plaintiffs alleged. Specifically, he states that plaintiffs accused him of "allegedly using various positive and negative inducements to coerce them into permitting him to perform oral sex on them on one or more occasions," and that Ruelas also alleged that Shelby had given him a cellular telephone in exchange for sexual favors. Similarly, in listing the various categories of evidence that were purportedly inadmissible under Evidence Code sections 1101 and 352,

53

Shelby again provides only scant details, i.e., that various wards accused him of "having sex" with him, some in exchange for contraband, and that "a number of unidentified wards had told [Chaplain Castillo] of other alleged instances of sexual misconduct" by Shelby.

We do not consider error as an abstract proposition. A party's failure to fairly summarize the evidence in the light most favorable to the judgment results in forfeiture of evidentiary claims. (See, e.g., *Western Aggregates*, *Inc*. *v. County of Yuba* (2002) 101 Cal.App.4th 278, 290.) Here, Shelby merely asserts, without any meaningful discussion of the specific evidence he challenges or of the plaintiffs' allegations, that the "'prior bad acts' evidence does not share sufficient features with the allegations to fall under the common plan exception." Shelby's bald assertions of error are wholly inadequate to allow any meaningful analysis of the issue. We therefore find no error as to Shelby under Evidence Code sections 1101 and 352 concerning the testimony of Tovar and Gerard about Shelby's sexual conduct with them while they were wards.

3. Search of Shelby's Home Computer

All defendants challenge the admission of evidence that a search of Shelby's home computer some time after April 2005 had revealed that Shelby accessed a Web site where people can arrange to correspond with adult inmates.

Starmer testified that the search of Shelby's home computer revealed that the computer had been used to access the Web site "meetaninmate.com." The trial court overruled Shelby's objections on the grounds of hearsay and Evidence Code sections

54

352 and 1101. Harper and Ruiz's objections were overruled on the ground of irrelevance. Sharmer testified that the Web site was significant to his findings because "[c]learly, [Shelby] had an attraction for people in custody."

As to Harper and Ruiz, we conclude that the evidence was irrelevant because it was discovered after Shelby had left Stark, and it therefore had no probative value with respect to notice to Harper and Ruiz of Shelby's misconduct.

We agree with Shelby that the evidence was inadmissible under Evidence Code section 1101 because it did not show conduct sufficiently similar to that alleged by plaintiffs to establish a common plan; those allegations did not include any use of a computer.

4. Starmer's Conclusions

Shelby contends the trial court erred under Evidence Code section 1101 in admitting into evidence Starmer's conclusions that (1) Shelby had a "modus operandi" for coercing male Latino wards into having sex with him, (2) Shelby engaged in a seduction pattern, and (3) Starmer was trained to discern the truth, and he believed the accusers.

Evidence Code section 1101 permits evidence of prior conduct when relevant to prove, among other things, that a defendant's acts were carried out pursuant to a common plan. Starmer's conclusions that Shelby's conduct constituted a modus operandi and a seduction pattern was admissible for that purpose.

Starmer's statements that he was trained, could tell when someone was telling the truth, and believed the accusers, while improper opinion testimony, did not fit within Evidence Code section 1101, and Shelby's objection on the basis of that statute, was unfounded. .

G. *Irrelevant Evidence Admitted Against Harper and Ruiz*

Harper and Ruiz contend the trial court erred by admitting evidence obtained during the investigations that followed the February 2004 accusations against Shelby.

1. Additional Background

Harper and Ruiz moved in limine to exclude evidence obtained after February 18, 2004, the date the accusations that formed the basis of the current lawsuit surfaced. One ground for the motions was that such evidence was irrelevant to Harper and Ruiz's notice or knowledge of the substantial risk of a constitutional violation by Shelby. The trial court reserved its ruling on the motion and agreed to conduct a hearing under Evidence Code section 402 before allowing such testimony.

Later, in discussing the permissible parameters for opening statements, counsel for Harper and Ruiz noted that certain items were not to be admitted until that hearing was held. The trial court responded: "We're not doing a[n Evidence Code section] 402 process. Those are all coming in. You'll just have to deal with them. [¶] . . . [¶] And that's what my ruling was." Following additional argument, the trial court repeated that the challenged evidence would be admitted. Thereafter, counsel for Harper and Ruiz objected on the ground of relevance, among other grounds, when Cantino testified as to

56

what several wards had told him during the post-February 2004 investigations about Shelby performing sexual acts with them. The trial court overruled those objections.

2. Discussion

A plaintiff in an action based on deliberate indifference of prison officials bears a heavy burden of establishing that the officials knew of and disregarded a particular substantial known risk of the constitutional injury that later occurred. (*Farmer v. Brennan* (1994) 511 U.S. 825, 847 (*Farmer*).) Under that standard, information that became available to officials only *after* the injury to the plaintiff is irrelevant because it cannot show the officials' notice or knowledge of a risk. We thus conclude the trial court erred in allowing evidence of ward complaints made after February 18, 2004, to be admitted against Harper and Ruiz.

H. *Shelby's Off-duty Sexual Encounter*

All defendants challenge the admission of evidence that Shelby had an off-duty sexual encounter with former ward Gerard at a hotel in 2001. The defendants objected to such evidence on the grounds of hearsay, undue prejudice, prior bad acts, and irrelevance to establish notice. The trial court agreed that the evidence, discovered after plaintiffs came forward with their accusations, did not provide notice to Harper and Ruiz. The trial court allowed the evidence "for a narrowly defined issue. That is, that Shelby has gay sex and he has it with people who are at least former wards."

We will assume for purposes of argument that the evidence was inadmissible under Evidence Code section 1101 because the circumstances of the encounter were not

sufficiently similar to the conduct alleged by plaintiffs to show a common plan. Specifically, the encounter took place away from Stark after Gerard was no longer a ward, and the potential for coercion was not present. We further agree with Harper and Ruiz that the evidence was irrelevant to establish notice because the information became known only during the 2004 investigation.

I. *References to Shelby's Pretrial Invocation of His Fifth Amendment Privilege*

Shelby contends the trial court committed reversible error in permitting plaintiffs to raise his pretrial invocation of his Fifth Amendment privilege against self-incrimination.

### 1. Additional Background

During discovery, Shelby repeatedly asserted his Fifth Amendment privilege against self-incrimination. Plaintiffs moved in limine to prevent Shelby from testifying at trial as to those matters for which he had asserted that privilege, and Harper and Ruiz moved to compel Shelby to testify and to preclude him from asserting the privilege based on a proposed grant of use immunity. The trial court denied both motions, and later directed counsel for plaintiffs not to refer to the Fifth Amendment in their opening statements.

During opening statements, counsel for Ruelas referred to numerous allegations of misconduct against Shelby and stated: "[I]n the course of this trial, Mr. Shelby's not going to deny the truth of a single one. [¶] He has not to date and he will not." Counsel for Shelby did not object to those remarks. Shelby had not yet indicated he would

58

withdraw his Fifth Amendment privilege. However, after opening statements, Shelby's counsel indicated that Shelby would indeed testify at trial. The trial court ordered Shelby to appear for an additional deposition session, and plaintiffs' counsel deposed Shelby.

Thereafter, during the examination of Starmer, counsel for Ruelas asked: "[D]id you attempt to get Mr. Shelby's statement as to these events?" Over Shelby's counsel's objections under Evidence Code sections 960 and 913, Starmer responded that Shelby had "maintained his 5th Amendment privilege."

Next, during the examination of Shelby under Evidence Code section 776, counsel for Ruelas asked the following questions, over the objections of Shelby's counsel:

(1) "Did you assert your 5th Amendment not to answer questions of Mr. Cantino about whether you molested the plaintiffs in this case?"

(2) "Cantino couldn't talk to you because he did the wards. You refused and took the 5th Amendment to Agent Starmer, correct?"

(3) "Is it true, sir, that every single question propounded to you on the subject of whether you molested the plaintiffs in this case, up through the first day of this trial, you asserted the 5th Amendment, your right against criminal prosecution? Refused to answer every question?"

(4) "You waited until the statute of limitations for criminal prosecution expired and then you said you wanted to testify; isn't that correct?"

Shelby responded that he had acted on his attorney's advice.

59

Out of the presence of the jury, Shelby's counsel moved for a mistrial. The trial court stated: "I thought the record showed we were going to allow him to at least go into that because of the circumstances where you, after opening statement, now tell us that he's going to waive the 5th Amendment, he's going to testify, after they'd already concluded discovery." Counsel for Ruelas argued that he would have been prejudiced if he had not been allowed to raise the Fifth Amendment issue after mentioning it in opening statement before Shelby decided to waive the privilege. The trial court denied the request for mistrial.

Counsel for Shelby later requested a jury admonishment or limiting instruction based on Evidence Code section 913, subdivision (b). The court stated such an instruction would be appropriate later but declined to read the instruction at that time. The trial court instructed the jury at the close of trial: "'You have heard testimony that prior to trial, James Shelby has exercised his legal right not to testify concerning certain matters. Do not draw any conclusions from the exercise of this right or let it affect any of your decisions in this case. [¶] A party may exercise this right freely and without fear of a penalty.'"

2. Analysis

California law makes no distinction between civil and criminal litigation concerning the impermissibility of drawing adverse inferences from a witness's invocation of the privilege against self-incrimination. (*People v. Holloway* (2004) 33 Cal.4th 96, 131-132.) Evidence Code section 913 provides: "(a) If in the instant

60

proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding. [¶] (b) The court, at the request of a party who may be adversely affected because an unfavorable inference may be drawn by the jury because a privilege has been exercised, shall instruct the jury that no presumption arises because of the exercise of the privilege and that the jury may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding."

We first observe that with respect to Ruelas's counsel's remarks during opening statement, Shelby forfeited any claim of error by failing to raise a timely objection. (See *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 860 [Fourth Dist., Div. Two].)

Next, Shelby's conduct in deciding to waive his privilege only after opening statements and after the close of discovery smacks of the conduct condemned in *A & M Records*, *Inc. v. Heilman* (1977) 75 Cal.App.3d 554, in which the court stated: "[T]he enactment of the Discovery Act of 1957 was intended to take the 'game element' out of trial preparation and do away with surprise at trial. [Citation.] The accomplishment of this purpose compels the court to prevent a litigant claiming his constitutional privilege against self-incrimination in discovery and then waiving the privilege and testifying at trial. Such a strategy subjects the opposing party to unwarranted surprise. A litigant

61

cannot be permitted to blow hot and cold in this manner." (*Id*. at p. 566.) Under that case, the trial court could have precluded Shelby from testifying about matters as to which he had previously claimed the privilege. Instead, the trial court allowed plaintiffs to depose him before his testimony. Moreover, at trial, Shelby explained his pretrial invocation of the privilege as having been based on instruction of his counsel.

Even if we assume error in allowing questions about the invocation of the privilege, the trial court did instruct the jury in accordance with Evidence Code section 913, subdivision (b), that it could not use Shelby's invocation of the privilege to draw adverse conclusions against him. We presume the jury understood and followed the trial court's limiting instruction. (*Saari v. Jongordon Corp*. (1992) 5 Cal.App.4th 797, 808.)

Shelby also argues that the trial court committed misconduct in failing to give the curative instruction at the time of the challenged testimony rather than at the end of trial. However, Evidence Code section 913 does not specify when such an instruction should be given, but only that it should be given on request. The timing of such an instruction was a matter within the discretion of the trial court. (Code Civ. Proc., § 607a.) We find an abuse of discretion only when the trial court has "exceed[ed] the bounds of reason, all of the circumstances before it being considered." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) The trial court's determination to instruct on the privilege at the end of trial did not meet that stringent standard for finding an abuse of discretion.

J.  *Exclusion of Testimony of Landeros and Zendejas*

Shelby contends the trial court erred in excluding certain testimony of his witnesses Elizabeth Landeros and Salvador Zendejas.

1.  Additional Background

Landeros was a former YCC and supervisor at Stark.  Counsel for Shelby proposed calling her to testify that she had heard a ward, Francisco Dominguez, a former plaintiff who had been dismissed for failing to appear at his deposition, discussing with other wards, Canas and Navarette, what they should tell Cantino in their interviews. Dominguez, Canas, and Navarette were all unavailable as witnesses.  Counsel for Shelby made an offer of proof that Landeros would testify that "upon the ward's exit from the interview room with Mr. Cantino, [she] heard them exclaim that they were going to, 'Get that faggot out of here.'  That they had lawyers and that they were smiling and high-fiving one another."  The trial court ruled the evidence inadmissible.

Zendejas was a YCC at Stark from July 2002 to November 2006.  Counsel for Shelby asked him if he had a conversation with Dominguez about sexual allegations, and the trial court sustained plaintiffs' objection on the ground of irrelevance.  A discussion was held off the record and not reported.  Later, Shelby's counsel stated that he tried to get Zendejas's testimony admitted, testimony that included:  "[H]e heard ward Dominguez specifically [tell] him that he had been told what to say about Mr. Shelby. Mr. Dominguez was a former plaintiff.  That he received a note from other wards regarding what to tell investigators and what to say about Mr. Shelby."

2. Analysis

Shelby first argues that the proffered evidence was not hearsay because the statements "constituted 'operative facts' that had independent significance." We disagree.

The offer of proof relative to Landeros was that she overheard certain wards indicate that they were going to"[g]et that faggot out of here." If offered for the nonhearsay purpose that the complainants are biased against Shelby because of Shelby's sexual orientation, the impeachment value is extremely minimal based on the underlying facts of the case. In our view, however, the statement is clearly being offered for the implied statement that the complainants are fabricating their version of what occurred. "[E]vidence of an express statement of a declarant is nevertheless hearsay evidence if such evidence is offered to prove—not the truth of the matter that is stated in such statement expressly—but the truth of a matter that is stated in such statement by implication." (*People v. Allen* (1976) 65 Cal.App.3d 426, 433.) Here, the statement in conjunction with the "high fiving" by the speakers, was being offered for the implied statement that they were fabricating their version of events so that they could "get" Shelby. This fact was eventually acknowledged by defense counsel wherein he argued: "In this case, what she heard was an indication that the ward planned to fabricate a story of having some sexual contact with Mr. Shelby. . . ." Further, we do not believe the court abused its discretion in finding no applicable hearsay exception. Counsel focused on Evidence Code section 1230, the declaration against penal interest. While defense

64

counsel argued that the statement was an implied admission of fabrication, the statement could also be construed in a manner which does not suggest fabrication. One could easily interpret the statement and high fiving as being celebratory of the fact that the witnesses were allowed to truthfully relay facts to investigators and that finally Shelby was going to get fired. (See *People v. Frierson* (1991) 53 Cal.3d 730, 745 [in determining the trustworthiness of the statement (against the interest of) "the court may take into account not just the words but the circumstances under which they were uttered, [and] the possible motivation of the declarant  . . . ."].)

As to the proffered testimony of Zendejas, it also was being offered for the truth of the matter stated therein, that being, Dominquez was told what to say. With that said, however, it is impossible to determine whether the court abused its discretion in not allowing the testimony in that after plaintiffs' counsel objected, the matter was discussed off the record. Thereafter, defense counsel moved on to a new line of questioning.

It must also be noted that  considerable  evidence was presented to the jury concerning the possibility of fabrication of accusations and collusion among wards. Defense expert Larry Meisner testified:  "[T]here is evidence, as I recall, that wards were overheard talking with each other about what they were supposed to say in the investigation and how to nail Shelby."

Ruiz testified that he had read the investigative report concerning the Delgado grievance. The report stated that a staff member told the investigator that two

65

anonymous wards said Delgado had made up his complaint in order to be moved to another company.

In addition, Shelby's counsel asked Cantino whether wards had told him that "this whole thing was a fake, a set up?" Cantino responded: "I had a couple wards, I do believe. I don't remember the exact number. Yes, there were a couple wards I interviewed that said, it was bunk or fake."

Finally, Shelby's counsel argued that wards had filed false accusations to get rid of him. One ward, Ortiz, who had previously reported that Shelby had orally copulated him in an office, testified at trial that he had made up the story because Shelby was strict, and Ortiz did not want him to return to Stark.

In light of the extensive evidence on the issue, the proffered testimony of Landeros and Zendejas would have been merely cumulative. The trial court did not abuse its discretion in excluding their testimony. (*Tip Top Foods*, *Inc. v. Lyng* (1972) 28 Cal.App.3d 533, 554.)

K. *Exclusion of Impeachment Evidence*

Shelby contends the trial court erred in excluding the impeachment testimony of Monica Martinez and Don Krueger.

1. Monica Martinez

(a) ***Additional Background***

In his opening statement, counsel for Ruelas stated that Ruelas had tried to commit suicide. Ruelas testified that in July 2005, after his release from Stark, he tried to kill

66

himself by slitting his wrist, and he showed his scars to the jury. He testified his suicide attempt was a result of depression he suffered because of the sexual abuse. At the hospital for treatment of the cuts, he told hospital personnel that he had fallen off a chair through a window. Ruelas testified that he had lied about how he had received the cuts because he did not want to be sent for psychiatric treatment.

Ruelas also testified, without further elaboration, that he had "some sexual problems or dysfunction" that he attributed to the abuse. Defendants did not cross-examine him on that point. He conceded that he had gone on "a couple of dates" with Martinez before he met his wife and had sexual relations with Martinez.

Counsel for Shelby called Ruelas's wife, Jasmin Sharafadin, as a witness under Evidence Code section 776. Sharafadin testified that in July 2005, possibly on the day of Ruelas's suicide attempt, she went to Martinez's home to talk about Martinez's relationship with Ruelas. Sharafadin became angry when Martinez would not talk to her, and she slashed a tire on Martinez's car with a knife. The same day, Sharafadin had a physical altercation with Martinez's sister-in-law, and Ruelas had to separate the two women. Sharafadin denied there was any connection between the events at Martinez's house and Ruelas's hospitalization.

The court held an Evidence Code section 402 hearing at which Martinez testified she had dated Ruelas between 2004 and 2005; that their relationship ended about two months before Sharafadin showed up at her house and slashed her car tire; that Ruelas

and she had sexual relations around 30 times; and that Ruelas did not have any sexual performance problems when he was with her.

(b) **Analysis**

Shelby asserts on appeal that Martinez was called "to directly refute Ruelas' testimony relating to his damages." However, Shelby did not bring a motion for a new trial on the issue of excessive damages, and he is therefore precluded from raising the issue for the first time on appeal. (*Sholar v. Barker* (1962) 211 Cal.App.2d 31, 32-33.)

Shelby further asserts that Martinez's testimony "would have suggested to the jury that <u>Ruelas lied under oath</u> when he testified that he suffered from sexual dysfunction and had attempted suicide as a result of the alleged sexual abuse." However, Ruelas's testimony about sexual dysfunction was brief and nonspecific, and Martinez's proffered testimony related only to Ruelas's relationship with her five or six years before the trial. Such testimony would thus have been of marginal relevance to any continuing or later developing problems Ruelas might have suffered. Moreover Martinez's proffered testimony about the events of July 2005 was largely cumulative to that of Sharafadin. We conclude Shelby has not shown that the trial court abused its discretion in excluding Martinez's testimony.

2. <u>Don Krueger</u>

Shelby contends the trial court erred in excluding impeachment testimony of Lieutenant Don Krueger concerning the details of Ruelas's felony conviction.

(a) **Additional Background**

The trial court granted plaintiffs' motion in limine to exclude evidence regarding the nature of their underlying commitment offenses. However, during opening statement, counsel for Ruelas stated: "Mr. Ruelas at 17 years old was in a stolen car and arrested. He didn't steal the car, but in his neighborhood and his background and where you come from, you don't say who did. The people . . . got away and he didn't say who they were. He got three years for that. [¶] They had picked him up at a movie with his girlfriend, and he was in the back of the car when they got stopped. And that's—he's in a stolen car, and he's not cooperating with the investigation, and he was sentenced. He was 17 years old, a juvenile. So he was in juvenile court sentenced to three years."

Ruelas testified he "took the blame" for the "carjacking and receiving stolen property." He denied that he had stolen the vehicle and stated that he had been "standing near a vehicle that had been stolen by a friend." On cross-examination, Ruelas acknowledged that he had been sentenced for felony carjacking.

Shelby's counsel stated that he planned to call Krueger. Krueger had arrested Ruelas for carjacking. He would testify about the night of Ruelas's arrest, and about the fact that Ruelas was an active participant in the carjacking. Following additional discussion, the trial court ruled that it would exclude Krueger's testimony.

(b) **Analysis**

Shelby argues that Krueger's testimony should have been admitted under Evidence Code section 780, subdivision (i), which allows the jury to consider evidence

69

that "has any tendency in reason to prove or disprove the truthfulness" of any witness, including "[t]he existence or nonexistence of any fact testified to by him."

However, Krueger's proffered testimony, that Ruelas actively participated in the carjacking, would not have directly contradicted that of Ruelas, who himself testified that he had taken the blame for the carjacking. We therefore conclude that the trial court did not abuse its discretion in excluding Krueger's testimony.

Even assuming error, such error was not prejudicial. Shelby argues that "Ruelas' testimony and credibility were critical to the case, as he was the only one of the [plaintiffs] to testify." Not so. All four plaintiffs testified at trial and were extensively cross-examined.

L. *Opinion Evidence*

Shelby contends the trial court committed reversible error in allowing expert opinion testimony on the ultimate issue.

1. Additional Background

During his opening statement, counsel for Harper and Ruiz told the jury investigators for the CYA IA and the Chino Police Department had investigated reports of misconduct by Shelby. Counsel continued: "They found no corroborative evidence of any misconduct by Shelby with respect to the plaintiffs. Not one document. Not one piece of DNA. Not one witness whoever saw anything. [¶] It was presented to the DA here in San Bernardino County December '04, was rejected for prosecution."

70

Out of the presence of the jury, counsel for plaintiffs argued that the door had been opened for evidence that information had been submitted to the district attorney and charges had been recommended. Shelby's counsel argued that the codefendants, not Shelby, had opened that door. Counsel for Harper and Ruiz conceded that the remarks during opening statement had been an error that could be resolved with an instruction. The court ruled that plaintiffs could ask Cantino about any direct evidence and "go into" what had been recommended to the district attorney.

Thereafter, Cantino responded, "yes" to the question, "Did you recommend criminal prosecution of Mr. Shelby to the district attorney's office?" after the trial court overruled Shelby's counsel's objection on the grounds of "ultimate fact" and "peace officer's conclusion." Counsel for Harper and Ruiz did not interpose an objection.

Starmer testified that he had submitted his report to the district attorney's office and felt there was sufficient evidence for a criminal prosecution. No objections were raised as to that testimony.

Whitworth testified that he had submitted the case for prosecutorial review to the district attorney. He responded, "yes," to the question, "And from your work, the totality of your investigation, did you think it should be submitted to the district attorney for their determination as to whether or not it should be criminally prosecuted?" The trial court overruled defendants' objections on the ground of improper opinion of an investigator, among other objections.

(2) <u>Analysis</u>

"Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805; see *North American Capacity Ins. Co. v. Claremont Liability Ins. Co.* (2009) 177 Cal.App.4th 272, 294.) Thus, Shelby's contention that the challenged testimony was inadmissible on the ground it went to the ultimate issue is not well taken.

California courts have indicated that counsel's remarks during opening statement, because such remarks are not evidence, do not "open the door" to admission of evidence on the same subject. (See, e.g., *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 600-604 [counsel's reference in opening statement to defendant's willingness to take a lie detector test did not permit plaintiff to inquire into the subject, especially when plaintiff had not objected to the statement]; accord, *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1027-1028.) We will therefore assume for purposes of argument that counsel's remarks did not open the door to the admission of evidence on the subject. However, in *Winfred D.*, the court cited with approval a line of cases from other states holding that a curative instruction or, if necessary, a mistrial, is the appropriate remedy for improper remarks made in opening statements. (*Winfred D. v. Michelin North America, Inc.*, *supra*, at p. 1027.) Shelby has not provided any citation to the record indicating that he requested such an instruction.

In any event, we discern no undue prejudice from the introduction of the investigators' conclusions because the jury repeatedly heard evidence that those

conclusions were ultimately *rejected* by the prosecutors, who declined to pursue criminal charges against Shelby on the grounds that there was no corroborating physical evidence and Shelby's accusers lacked credibility. For example, Starmer testified on cross-examination by Shelby's counsel that when he started his investigation, he first reviewed a prosecution rejection letter from the Cantino and Whitworth investigation. He agreed that one of the reasons for the rejection was the lack of physical evidence. Such evidence effectively counterbalanced any prejudice from the evidence to which Shelby now objects.

M. *Evidence of Shelby's HIV Status*

Shelby contends the trial court erred by admitting evidence of his HIV status.

In 2006, Starmer informed plaintiffs that Shelby had tested positive for HIV and recommended they be tested. All plaintiffs tested negative.

The trial court initially granted Shelby's motion in limine to exclude evidence of his positive HIV status on the ground it was irrelevant and was more prejudicial than probative under Evidence Code section 352. However, the trial court later permitted plaintiffs to recall Shelby to the witness stand for cross-examination about his HIV status on the ground it was relevant to plaintiffs' claims for punitive damages.

Shelby was asked the following questions:

(1) "Do you think that it would be reckless to force somebody through threats of intimidation to engage in anal sex with a person who's HIV positive?"

73

(2) "Does it make it worse, in your opinion, to force somebody to have sex if you're HIV positive and you don't tell them?"

(3) "[D]oesn't [it] make it worse to force someone into anal sex if you're HIV positive without warning them?"

Shelby responded that it was wrong to threaten someone or force someone to have sex.

The trial court stated that an instruction limiting the evidence to the issue of punitive damages would be appropriate. However, Shelby has not provided any citation to the record to establish that he requested such an instruction. We therefore conclude that his contention of error was forfeited. (*Boeken v. Philip Morris*, *Inc*. (2005) 127 Cal.App.4th 1640, 1694, fn. 27.)

N. *Prejudicial Effect of Errors as to Shelby*

A judgment should be reversed only when an appellant shows that a miscarriage of justice has occurred. (Cal. Const., art. VI, § 13.) A miscarriage of justice is shown when, after examination of the entire cause, including the evidence, it is reasonably probable that a result more favorable to the appellant would have been reached in the absence of the error. (*Cassim v. Allstate Ins*. *Co*., *supra*, 33 Cal.4th at pp. 800-802.) Multiple errors may be found cumulatively prejudicial, even though independently they would have been deemed harmless. (*Johnson v. Tosco Corp*. (1991) 1 Cal.App.4th 123, 141.)

We have found error in the trial court's admission of evidence in violation of Evidence Code section 1045 and in the admission of related polygraph evidence. We have also found error in the admission of certain evidence in violation of Evidence Code section 1101, specifically, that an agent had searched a Web site on Shelby's home computer, "meetaninmate.com," and that Shelby had an off-duty sexual relationship with a former ward. Finally, we have assumed for purposes of argument that the trial court erred in allowing evidence of Shelby's pretrial invocation of his privilege against self-incrimination and we have found error in allowing testimony by investigators that they recommended that criminal charges be filed.

We nonetheless conclude that Shelby has failed to establish that the errors, whether considered singly or cumulatively, led to a miscarriage of justice. "The court must be convinced of the injurious nature of the error after an examination of the entire record. In other words, it must, to some extent, weigh the evidence, for the probability of injury from the error may be dependent on the state of the evidence." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 418, pp. 476-477.) While Shelby argues that all the errors were reversible, he has failed to make those arguments in the context of any meaningful discussion of the vast amount of admissible evidence at his trial. We will therefore affirm the judgment against him in favor of Ruelas, Espinoza, and Miranda.

O. *Sufficiency of Evidence*

Harper and Ruiz contend that the judgments against them should be reversed and the trial court should be directed to enter a new judgment in their favor on the ground the

evidence was insufficient to establish (1) that they had actual knowledge of a substantial risk of the constitutional injuries plaintiffs suffered; (2) the subjective belief element of a deliberate indifference claim against prison supervisory officials; (3) the conscious disregard element of plaintiffs' failure to protect claim; or (4) the elements of plaintiffs' cruel and unusual policy claim.

1. Standard of Review

When a party in an appeal challenges findings of fact, this court is "bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] [The court] must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053, superseded by statute on another ground as stated in *Eller Media Co. v. City of Los Angeles* (2001) 87 Cal.App.4th 1217, 1219-1220, fn. 3.) The appellant must provide a fair summary of the evidence, and failure to do so results in forfeiture of the claim of lack of substantial evidence to support the verdict. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 749.) The duty to adhere to procedural rules grows with the complexity of the record. (*Akins v. State of California* (1998) 61 Cal.App.4th 1, 17, fn. 9.)

2.  Elements of a Section 1983 Claim Under *Farmer*

Section 1983 provides for a cause of action against "[e]very person who," under color of state law, "subjects, or causes to be subjected," another person to a deprivation of a federally protected right.  To state a claim under section 1983, the plaintiff must plead that a government official has personally violated his or her constitutional rights. (*Ashcroft v. Iqbal* (2009) 556 U.S. 662, 676 (*Iqbal*).)

In *Farmer*, the court held that a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment.  The term "deliberate indifference" requires a showing that the official was subjectively aware of the risk:  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  (*Farmer*, *supra*, 511 U.S. at p. 837.)  The court continued:  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  (*Id.* at p. 838.)

Thus, for a prison official to be found deliberately indifferent under a failure to protect theory, the plaintiff must prove that before his or her injury:  (1) the official personally actually knew of facts from which the inference could be drawn that there was a substantial risk of such injury occurring; (2) the official in fact subjectively drew such

77

inference; and (3) the official consciously or recklessly disregarded the risk. (*Farmer*, *supra*, 511 U.S. at pp. 836-840, 846-847.) "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "'reasonable safety,'" [citations], a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions,' [citations]. Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." (*Id.* at pp. 844-845.)

The court uses an objective standard to evaluate the element of a substantial risk of serious harm. (See *Marsh v. Butler County* (11th Cir. 2001) 268 F.3d 1014, 1028-1029, 1031 (en banc), abrogated on other grounds by *Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, as recognized by *Gilmore v. Hodges* (11th Cir. 2013) 738 F.3d 266, 278.) The element of defendant's deliberate indifference to that risk has two components, one subjective and one objective. To satisfy the subjective component, a plaintiff must establish that the defendant "actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm." (*Rodriguez v. Secretary for the Dept. of Corrections* (11th Cir. 2007) 508 F.3d 611, 617, fn. omitted, citing *Farmer*, *supra*, 511 U.S. at pp. 829, 837, 844.) To satisfy the objective component, a plaintiff must establish that the defendant "disregard[ed] that known risk by failing to respond to it in an (objectively)

78

reasonable manner." (*Rodriguez v. Secretary for the Dept. of Corrections*, *supra*, at p. 617.)

Because liability in a section 1983 case is personal, we must separately consider the sufficiency of the evidence as to each defendant. (*Iqbal*, *supra*, 556 U.S. at p. 676.)

(a) **Sufficiency of Evidence of Actual Knowledge**

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, [citation], and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. [Citation.] For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.'" (*Farmer*, *supra*, 511 U.S. at pp. 842-843.)

Even if the risk is obvious, "a prison official may show that the obvious escaped him, [citation], [but] he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist . . . . When instructing juries in deliberate indifference cases with such issues of proof, courts should be careful

to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known, and juries should be instructed accordingly." (*Farmer*, *supra*, 511 U.S. at p. 843, fn. 8.)

"Because, however, prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." (*Farmer*, *supra*, 511 U.S. at p. 844.)

Harper became director in May 2000. He received the OIG October 3, 2000, report discussing the prior allegations against Shelby. Included within the 9 page report was: (1) Beck's allegation that he witnessed Shelby orally copulating Rivera; (2) Shelby's proposition to Tovar, that Tovar allow Shelby to orally copulate him in exchange for not reporting Tovar's possession of marijuana; (3) the alleged attack on Guerrero-Valles for referencing to Shelby that Guerrero-Valles had heard that Shelby was performing sexual favors for wards; and (4) Perez's complaint that while wearing only a towel around his waist, Shelby placed his hand on Perez's hip and began to move

his hand lower. Harper did not recall if he received or looked at the underlying attachments. The OIG criticized the handling of all four allegations. Harper knew the latter two allegations had been reinvestigated and found to be unsubstantiated. He did not recall if he had read the report of the reinvestigation of Perez's complaint.

Harper was aware of Walker's grievance wherein Shelby handcuffed Walker, grabbed Walker's buttock and indicated that he could handle Walker himself. Walker interpreted this comment as being a sexual comment. Harper knew that the IA agent who had investigated the complaint had deemed it to be unmeritorious. Harper did not recall if he had seen the Tanori grievance, and he did not know if the OIG had ever recommended further investigation, but he thought they had. Harper was unaware of the Delgado and Johnson grievances. Harper did not recall if he had ever read the entire 1999 Westlund report.

As to Ruiz, the evidence showed that he was aware that Westlund had recommended sustaining the 1999 allegation of immoral sexual behavior based in part on Tovar's report of a sexual proposition and Beck's observation of Shelby orally copulating Rivera.[7] Ruiz had recommended terminating Shelby on the basis of the 1999 allegations. Ruiz knew of the subsequent allegations of sexual misconduct raised by Perez, Guerrero-

---

[7] Tovar's report of a sexual proposition was corroborated in part by Westlund's discussion with a maintenance worker wherein the worker told Westlund that he got the impression that something sexual had occurred between Shelby and Tovar.

Valles, and Walker.[8] He was also aware of Delgado's allegation that when Delgado was taking a shower Shelby was looking at him and told Delgado that he was "packing." Delgado's allegation contained a further reference that Shelby told Delgado that he wouldn't have to worry about anything financial if he let Shelby "give [him] oral." Ruiz further knew of Tanori's grievance that Shelby had sexually harassed him. He also knew of Johnson's grievance which accused Shelby of offering job opportunities and other perks to wards if they engaged in sexual activities. Johnson also reported that one ward would expose his penis to Shelby and masturbate while Shelby watched.

Harper and Ruiz contend that before February 2004, the only information available to them consisted of unsustained allegations against Shelby, and that a pattern of unsubstantiated complaints is insufficient to establish their actual knowledge of a substantial risk that Shelby would coerce wards into sexual acts. Harper and Ruiz rely on *Brooks v. Scheib* (11th Cir. 1987) 813 F.2d 1191, in which the court reversed judgment against the City of Atlanta in an action based on a police officer's alleged assault. Even though the officer had been accused of similar misconduct seven times before the incident with the plaintiff, the court explained: "Quite simply, there is no evidence that city officials were aware of past police misconduct. [Citations.] Brooks never demonstrated that past complaints of police misconduct had any merit. Indeed, the number of complaints bears no relation to their validity. In Scheib's case, for example,

---

[8] In conjunction with the Perez complaint, three other wards stated they heard conversations of a sexual nature between Shelby and Perez.

there is a logical explanation as to why a large number of complaints have been lodged against him: Officer Scheib patrolled a high crime area. A significant percentage of those Scheib arrested were continually in trouble with the law. These experienced 'customers' frequently use citizens' complaints as a means of harassing officers who arrest them. The City presented testimony that each complaint was fully investigated and found to be lacking in merit. In sum, there is no evidence that would allow a jury to find that the City knew or should have known that the natural consequence of its policy and practices would be the deprivation of constitutional rights." (*Id.* at p. 1193.)

Harper and Ruiz also cite: (1) *Hernandez v. Woodford* (E.D.Cal., Mar. 12, 2009, No. Civ. S-07-0252 GEB EFB P) 2009 U.S.Dist. Lexis 19715, at page *21 (granting summary judgment to the prison supervisor because the plaintiff failed to allege sufficient details, "[i]nsofar as he suggests that [the guard] had a pattern and practice of abusing prisoners such that maintaining him in any position where he would have contact with prisoners would constitute deliberate indifference," and he failed to offer evidence of the guard's prior conduct or the supervisor's knowledge of it); (2) *Daniels v. Delaware* (D.Del. 2000) 120 F.Supp.2d 411 at page 420 (allegations of sexual misconduct that were investigated and found to be unsubstantiated were insufficient to establish supervisor liability); and (3) *Sauceda v. Dailey* (D.Kan., June 12, 1998, No. 97-2278-JWL) 1998 U.S.Dist. Lexis 11460, at pages *38-*39, and footnote 8 (prior complaints about an officer that were investigated and resolved in favor of the officer were insufficient to

establish a county's deliberate indifference; the plaintiff did not argue that the investigations had been inadequate).

Although we find *Brooks* and the other cases cited helpful, they are not dispositive because they are distinguishable on several bases. First, unlike in *Brooks*, evidence in the instant case showed that certain allegations had not been fully investigated or found to be lacking in merit. Most significantly, the investigator initially determined that the Tovar and Beck-Rivera allegations should be *sustained*, and Shelby's termination had been recommended on the basis, at least in part, of these allegations. Moreover, the grievance filed by ward Tanori was terminated when Tanori was paroled, and the record does not show that any investigation had taken place. Delgado's grievance was denied on the basis of a preliminary inquiry report; no IA investigation was conducted, even though Delgado's allegations bore remarkable similarity to Tovar's allegations. Johnson's grievance was summarily denied without investigation on the basis that it was based on hearsay.

Second, in the present case, the OIG had specifically raised concerns about the handling of prior claims of Shelby's sexual misconduct and recommended more stringent examination of such claims.

Third, in the present case, the nature of the complaints was independently significant. While the evidence showed that ward grievances were common, the evidence was also undisputed that complaints alleging homosexual conduct by a male staff member against a male ward were exceedingly rare. As recounted, *ante*, plaintiffs'

84

expert Cohn testified that juvenile wards rarely complain about homosexual behavior on the part of staff. He explained that wards are intimidated in an institution and are embarrassed about homosexual behavior. Cohn stated: "So it's not uncommon when something like this does occur they would hold that information and don't report it because they don't want to be accused of being gay, especially if they're not gay." Similarly, defense expert Izaguirre agreed that in his experience, "allegations of homosexual contact between wards and staff was a very, very rare thing, if it ever occurred at all." Harper conceded that it was unusual for a male ward to allege that a male staff member had been sexually abusive to him. In his experience as director, he had learned of six to 10 allegations of sexual misconduct between staff and wards, but the only ones that involved a male staff member and a male ward pertained to Shelby. Moreover, Shelby was the only employee, out of approximately 5,400 employees in the CYA, who had three or more allegations of sexual misconduct made against him.

Ruiz did not believe he had ever discussed Shelby's fitness as an employee with Harper. Harper conceded he had the authority to remove Shelby from contact with wards even if other impediments prevented him from terminating Shelby's employment. Ruiz could also do so in an emergency.

We first conclude that the evidence against Harper and Ruiz satisfied *Farmer*'s requirement of objective evidence that there was a strong likelihood or "substantial risk" that Shelby would sexually assault wards. (*Farmer*, *supra*, 511 U.S. at pp. 842-844.)

With respect to the requirement of actual knowledge, we conclude that the evidence was sufficient to establish that both Harper and Ruiz must have known of that substantial risk and, therefore, had actual knowledge that Shelby posed a substantial danger of coercing wards at Stark to participate in sexual acts. While Harper and Ruiz argue extensively that Tovar's allegations, the October 3, 2000, OIG report, and other evidence were not credible, under the standard governing our review, we "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." (*Bickel v. City of Piedmont*, *supra*, 16 Cal.4th at p. 1053.) Plaintiffs presented no direct evidence that either Harper or Ruiz actually believed there was a substantial risk of Shelby seriously harming wards; the direct evidence was to the contrary. Harper testified that after reading the October 3, 2000, OIG report, he concluded there was not enough evidence to believe Shelby had engaged in any sexual misconduct with Tovar. Ruiz also testified that he never believed Shelby posed any substantial risk of seriously harming wards. However, the trier of fact was free to disregard or disbelieve their testimony. Also, Harper testified that after he received the October 3, 2000, OIG report, he made special arrangements with Ruiz to meet Shelby inconspicuously so he could see what Shelby "looked like." The jury could reasonably infer from such curiosity that Harper had substantial concerns about whether Shelby posed a risk of harming wards.

We likewise conclude the same: The evidence summarized, *ante*, was sufficient to establish the element of subjective awareness. In *Farmer*, the court explained: "[A]

86

factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious . . . 'so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of.'" (*Farmer*, *supra*, 511 U.S. at p. 842.)  In *Gonzales v. Martinez* (10th Cir. 2005) 403 F.3d 1179, for example, the court held that evidence of prior nonsexual physical assaults, lapses in jail security, and sexual harassment and intimidation by guards was sufficient to support a reasonable inference that a sheriff was aware of the risk of sexual assault on female inmates.  (*Id.* at p. 1187.)

In *Mitchell v. Rappahannock Regional Jail Authority* (E.D.Va. 2010) 703 F.Supp.2d 549, 561, the court held that allegations that prison officials had received prior oral and written reports from a correction officer that a guard had been "'messing around'" with the plaintiff, but that the prison officials had done nothing in response, were sufficient to state a complaint against the officials when the plaintiff was sexually assaulted by the guard after those reports.

(b) **Sufficiency of Evidence of Conscious Disregard**

Harper and Ruiz argue that there was insufficient evidence to establish that defendants consciously or recklessly disregarded the known risk.  We disagree.

As previously discussed, the evidence is abundant that Harper and Ruiz were fully aware over a period of years that Shelby was being accused by numerous wards of engaging in sexual conduct with the wards.  Harper and Ruiz were further aware that

Shelby was in a position of power over the wards. To have this knowledge and do nothing is conduct, or lack thereof, in conscious disregard of individuals confined under their supervision. As noted in *Farmer*, *supra*, 511 U.S. at page 837, a prison official acts in conscious disregard when the "official knows of and disregards an excessive risk to inmate health or safety . . . ."

As has been discussed, there is ample evidence that both Ruiz and Harper were fully aware of facts that Shelby posed a substantial risk to wards, yet they did nothing; the conduct was egregious. It is conduct that demanded immediate action, rather than an attitude of complete indifference. The evidence clearly supports the conclusion that by defendants turning a blind eye to Shelby's conduct they acted in conscious disregard of plaintiffs' rights. Defendants argue that they lacked the authority or ability to do anything. This is not so. Both Harper and Ruiz had the authority and power to move Shelby to another position, yet failed to do so.

(c) **Sufficiency of Evidence of Causation**

Harper and Ruiz contend the evidence was insufficient to establish the causation element of plaintiffs' claims.

A plaintiff who seeks to hold a prison official liable for a deliberate indifference claim under the Eight Amendment must establish that the official's conduct caused the injury. (See *Martinez v. California* (1980) 444 U.S. 277, 285.) "The inquiry into causation must be individualized and focus on the duties and responsibilities of each

88

individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation.  [Citations.]"  (*Leer v. Murphy* (9th Cir. 1988) 844 F.2d 628, 633.)

In raising the argument that evidence of causation was insufficient, Harper and Ruiz fail to discuss any evidence that supported plaintiffs' claims, including any mention of the evidence of the acts on which those claims were based.  Rather, they merely state that "there was insufficient evidence of a causal link between [their] conduct and the injuries alleged by respondents to support a judgment against either of them."  A defendant seeking to overturn a judgment on the ground of insufficient evidence bears the responsibility of setting forth all the evidence bearing on the issue in the light most favorable to the judgment.  (*Myers v. Trendwest Resorts*, *Inc*., *supra*, 178 Cal.App.4th at p. 749.)  Having failed to do so, Harper and Ruiz have forfeited their claim that evidence of causation was insufficient.

We conclude that the evidence was sufficient to establish plaintiffs' claims based on deliberate indifference.

### (d)  **Sufficiency of Evidence of Deficient Policy**

A prison official may be liable under section 1983 for implementing a cruel and unusual policy or for failing to correct a condition with an appropriate policy.  (*Iqbal*, *supra*, 556 U.S. at p. 676; *Beers-Capitol v. Whetzel* (3d Cir. 2001) 256 F.3d 120, 134-135.)  "The deliberate indifference claims implicating supervisors for their deficient policies are more complicated than the other, more direct deliberate indifference claims, because the former add another level to the analysis."  (*Beers-Capitol v. Whetzel*, *supra*,

at p. 133.) "[T]o hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." (*Id.* at p. 134.)

As Harper and Ruiz point out, the trial court never required plaintiffs to identify the specific policy on which they based their claim of cruel and unusual policy. The trial court's instructions on that claim were defective.

P. *Qualified Immunity*

Harper and Ruiz argue that they were entitled to qualified immunity because plaintiffs failed to establish their conduct violated clearly established federal constitutional or statutory law of which a reasonable person would have known.

1. Additional Background

Harper and Ruiz requested a separate trial on the issue of qualified immunity. The trial court denied the motion. At the close of trial, Harper and Ruiz again raised the issue in a motion for directed verdict, but the trial court denied that motion as well.

2. Standard of Review

"The issue of whether qualified immunity exists is ultimately one of law for the trial court. [Citation.] Disputes of historical fact relevant to the issue, however, must be

90

decided by a jury. [Citations.]" (*Wood v. Emmerson* (2007) 155 Cal.App.4th 1506, 1515.)

3. Analysis

Public officials are entitled to qualified immunity for their actions unless the plaintiff shows that their conduct violated clearly established federal constitutional or statutory law of which a reasonable person would have known. (*Anderson v. Creighton* (1987) 483 U.S. 635, 639.) In determining whether an official is entitled to qualified immunity, the court determines: (1) whether a constitutional right was violated, taking the alleged facts in the light most favorable to the injured party; and (2) whether the law was clearly established when the violation occurred. (*Saucier v. Katz* (2001) 533 U.S. 194, 200-201, overruled in part by *Pearson v. Callahan* (2009) 555 U.S. 223, 227.) "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. [Citation.]" (*Saucier v. Katz*, *supra*, at p. 202.)

"Since public officials exercising discretionary powers may sometimes abuse their discretion, the immunity is qualified, rather than absolute, so that civil damages can serve as a restraint. At the same time, the immunity incorporates a recognition that 'claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole.' [Citation.] While unproductive societal costs may be unavoidable in a system that relies on private litigation as one means to enforce our constitutional norms, the aim of qualified immunity is to limit those costs to

91

the greatest practical degree.  We do not want to let the threat of litigation and personal liability 'deter[] . . . able citizens from acceptance of public office[,]' nor do we want to 'dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties.'  [Citation.]  Hence, '[t]his immunity is broad in scope and protects "all but the plainly incompetent or those who knowingly violate the law."'  [Citations.]"  (*Curley v. Klem* (3d Cir. 2007) 499 F.3d 199, 206.)

Ordinarily, courts look to prior case law to determine whether the contours of the right have been defined at a level sufficiently clear to give notice to a reasonable official. Although this does not require that the specific action in question was previously held unlawful, clearly established law may not be defined "at a high level of generality." (*Ashcroft v. al-Kidd* (2011) ___ U.S. ___ [131 S.Ct. 2074, 2084].)  Nonetheless, "general statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question . . . ."  (*U.S. v. Lanier* (1997) 520 U.S. 259, 271.)  And "some conduct is so obviously contrary to constitutional norms that even in the absence of case law, the defense of qualified immunity does not apply."  (*Skrtich v. Thornton* (11th Cir. 2002) 280 F.3d 1295, 1305, fn. 9.)

In *Schwenk v. Hartford* (9th Cir. 2000) 204 F.3d 1187, the court stated:  "A sexual assault on an inmate by a guard—regardless of the gender of the guard or of the prisoner—is deeply 'offensive to human dignity.'"  (*Id.* at p. 1197.)  In *Farmer*, the court stated:  "Being violently assaulted in prison is simply not 'part of the penalty that

criminal offenders pay for their offenses against society.'" (*Farmer*, *supra*, 511 U.S. at p. 834.)  "As a result, in *Farmer*, the Supreme Court held that prison officials may be held liable under the Eighth Amendment for the rape of a transsexual inmate by another inmate if the officials knew that the victim faced a substantial risk of serious harm and they disregarded that risk by failing to take reasonable measures to abate it.  [Citation.] Thus, the shield that qualified immunity provides is limited to those officials who are either unaware of the risk or who take reasonable measures to counter it."  (*Schwenk v. Hartford*, *supra*, at p. 1197.)  While the current case does not involve a violent assault, the reasoning of *Farmer* and *Schwenk* is equally applicable.

Harper and Ruiz argue that it was not a settled issue whether sexual conduct between CYA staff and wards violated the wards' civil rights.  They contrast *Carrigan v. Davis* (D.Del. 1999) 70 F.Supp.2d 448 at pages 452-453 (concluding that as a matter of law, fellatio between a prison inmate and guard, even if consensual, was a per se violation of the 8th Amend.) with *Graham v. Sheriff of Logan County* (10th Cir. 2013) 741 F.3d 1118 at page 1125 (noting that it was a matter of first impression in the 10th Cir. whether consent could be a defense to an 8th Amend. claim based on sexual acts, and that other courts were divided in their approach to the issue).

However, plaintiffs' complaints alleged, and the evidence showed, that Shelby's sexual conduct was coercive, not consensual, and that it included substantial sexual contact.  We therefore reject the contention that the law was unsettled on the issue of whether such conduct violated constitutional rights.

93

In *Qasem v. Toro* (S.D.N.Y. 2010) 737 F.Supp.2d 147, the court rejected qualified immunity for prison officials. The court explained: "It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. [Citations.] Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable—if not unintelligible—decisions made with respect to plaintiff during the course of the [Inspector General's] investigation, the Court cannot say at this stage of the litigation that [the officials] are entitled to qualified immunity for their alleged actions." (*Id.* at pp. 153-154.)

In *Hope v. Pelzer* (2002) 536 U.S. 730 at pages 741-742, a majority of the court concluded that the defendants were not entitled to qualified immunity on the ground that case law, a state regulation, and a department of justice report, should have made it obvious to a reasonable official that the conduct was unconstitutional. Here, a California statute proscribes sexual activity between a peace officer and a confined person: "An employee or officer of a public entity detention facility, . . . who engages in sexual activity with a consenting adult who is confined in a detention facility is guilty of a public offense." (Pen. Code, § 289.6, subd. (a)(2).) The proscribed sexual activity includes sodomy, oral copulation, and masturbation (*id*., subd. (d)), and the consent of the confined person is not a defense (*id.*, subd. (e)). As noted, the jury found that none of the plaintiffs consented to sexual activity with Shelby.

We conclude that the trial court did not err in denying Harper and Ruiz's qualified immunity claims.

Q. *Jury Instructions*

Harper and Ruiz contend that the trial court erred in failing to give their proposed special instructions on alter ego liability, negligence, and the elements of the failure to protect and failure to adopt policies and practices claims. They further argue that the trial court erred in failing to instruct on the deference required to be given to prison officials' judgment.

### 1. Standard of Review

We apply de novo review to claims of instructional error. (*Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1373 [Fourth Dist., Div. Two].) In reviewing challenges to jury instructions, "we consider the jury instructions 'as a whole.'" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 83.) The trial court discharges its duty to instruct the jury "if its instructions embrace all points of law necessary to a decision." (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 553.)

"[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) Instructional error is prejudicial when it seems probable that the error affected the verdict. (*LeMons v. Regents*

95

*of University of California* (1978) 21 Cal.3d 869, 875.)  The determination of prejudice "depends heavily on the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury.  [¶] . . . [W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule v. General Motors Corp.*, *supra*, at pp. 580-581, fn. omitted.)

 2.  <u>Instructions Given on Failure to Protect</u>

 Special instruction No. 3, which was read to the jury, stated:  "Prison officials have a duty to protect incarcerated wards from sexual abuse.  In this case, plaintiffs claim that defendants Jerry Harper and/or Xavier Ruiz violated the 8th Amendment to the United States Constitution by showing deliberate indifference to a substantial risk of serious harm to plaintiffs.  [¶]  In order to establish his claim for violation of the 8th Amendment, each plaintiff must prove each of the following three things by a preponderance of the evidence:  [¶]  First, there was a substantial risk of serious harm to plaintiff, namely a substantial risk that James Shelby would coerce wards into sexual acts;  [¶]  Second, defendants Jerry Harper and/or Xavier Ruiz were deliberately indifferent to that risk;  [¶]  Third, plaintiff . . . would not have been subjected to James Shelby's sexual abuse if defendants Jerry Harper and/or Xavier Ruiz had not been deliberately indifferent.  [¶] . . . [¶]  I will now proceed to give you more details on the second of these three requirements.  [¶]  To show deliberate indifference, plaintiff must

show that defendants Jerry Harper and/or Xavier Ruiz knew of a substantial risk that plaintiff would be coerced into sex, and that the defendant(s) disregarded that risk by failing to take reasonable measures to deal with them. [¶] Plaintiffs must show that defendants Jerry Harper and/or Xavier Ruiz actually knew of the risk. Plaintiffs need not prove that the defendant or defendants knew precisely defendant James Shelby would coerce wards into sex so long as plaintiffs show that defendants . . . Jerry Harper and Xavier Ruiz knew there was an obvious and substantial risk to plaintiffs of such. [¶] . . . [¶] That [a] prison official knew of facts that he strongly suspected to be true and those facts indicated a substantial risk of harm to an inmate, the official cannot escape liability merely because he refused to take the opportunity to confirm those facts. [¶] . . . [¶] But keep in mind that mere carelessness or negligence is not enough to make an official liable. It is not enough for plaintiffs to show that a reasonable person would have known or that defendants Jerry Harper and/or Xavier Ruiz should have known of the risk to the plaintiffs. Plaintiffs must show that the defendant or defendants actually knew of the risk. [¶] If plaintiffs prove that there was a risk of serious harm to them, and that the risk was obvious, you are entitled to infer from the obviousness of the risk that defendants Jerry Harper and/or Xavier Ruiz knew of the risk. [¶] However, defendants Jerry Harper and/or Xavier Ruiz claim that even if there was an obvious risk, he was unaware of the risk. [¶] If you find that either defendant Jerry Harper and/or Xavier Ruiz was unaware of the risk, then you must find that he was not deliberately indifferent."

97

### 3. Requested Instruction on Alter Ego Liability

Harper and Ruiz proposed special instruction No. 4, as follows:  "The liability of each defendant must be proved individually and merely finding any one defendant liable to any Plaintiff is not sufficient to hold any other defendant liable to that Plaintiff.  [¶] Defendants Harper and Ruiz are sued in this case as individuals.  They are not the alter ego of the State of California and the State is not a party in this case.  Defendants Harper and Ruiz are not responsible for the acts of employees of the California Youth Authority simply because they held supervisory positions in that organization, although they are personally responsible for their own acts and omissions.  [¶]  Similarly, admissions and opinions of other employees of the California Youth Authority or the State of California are not to be deemed to be admissions binding on Defendants Harper and Ruiz."  The trial court refused the requested instruction.

In actions under section 1983, supervisory officials are not liable for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability; rather, they are liable based only on their own personal knowledge and actions, not the knowledge and actions of others.  (*Farmer*, *supra*, 511 U.S. at pp. 842-843.) Harper and Ruiz argue that in the absence of the requested instruction, the instructions given failed to adequately instruct the jury that it must find personal knowledge as a basis for their liability.

While the trial court did not explicitly instruct the jury that respondeat superior principles could not form the basis for Harper's or Ruiz's liability, the instructions given

98

repeatedly emphasized the requirement of personal knowledge. In special instruction No. 3, the trial court informed the jury that plaintiffs had to show that Harper and Ruiz "knew of a substantial risk . . . and . . . disregarded that risk by failing to take reasonable measures"; and that they "actually knew of the risk." The special verdict forms required the jury to find that Harper and Ruiz each "kn[e]w the conditions created a substantial risk of serious harm and/or sexual abuse and disregard[ed] that risk by failing to take reasonable measures to correct it." We conclude the trial court's instructions adequately conveyed to the jury that it must find personal knowledge as a basis for liability of Harper and Ruiz.

4. Requested Instructions on Subjective Belief and Actual Belief

Harper and Ruiz contend that the trial court failed to instruct the jury adequately on the subjective belief element of the failure to protect claim. They assert the trial court's instructions did not separately identify the subjective belief component of a deliberate indifference claim against prison officials.

Harper and Ruiz proposed special instruction No. 13, as follows: "The second element which Plaintiffs must prove in order to show that Defendant Jerry Harper or Defendant Xavier Ruiz was deliberately indifferent in a failure to protect the Plaintiffs is that the given defendant personally believed that there was a substantial risk that Defendant James Shelby would force sex on wards."

Harper and Ruiz further proposed special instruction No. 16, as follows: "However, even if you find that the risk was obvious, Defendant Jerry Harper or

99

Defendant Xavier Ruiz may still be able to show that they still did not actually believe that it existed; for example, they might show that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was not substantial."

The trial court denied special instruction No. 13, stating: "I don't think they have to personally believe that the allegations are true." The trial court also denied special instruction No. 16.

As discussed, *ante*, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." (*Farmer*, *supra*, 511 U.S. at p. 837.) Here, the instructions given repeatedly set forth the requirement of personal knowledge. With regard to actual belief, the trial court instructed the jury that Harper and Ruiz claimed "that even if there was an obvious risk, he was unaware of the risk," and if the jury found that if either was unaware of the risk, the jury had to find he was not deliberately indifferent. That instruction adequately conveyed to the jury that it must find subjective belief.

We further note proposed special instruction No. 13 (as well as other proposed instructions) misstated the law to the extent it would have required the jury to find a risk

100

of *forced* rather than coerced sex. The trial court may reject a requested instruction that contains incorrect statements of law. (*Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 782.)

5. Requested Instruction on Negligence

Harper and Ruiz proposed special instruction No. 5A, as follows: "The Plaintiffs have no claim against either Defendant Harper or Defendant Ruiz for negligence, and you may not base a judgment against either Defendant Harper or Defendant Ruiz upon any allegation or finding that they acted negligently or unreasonably. [¶] You may find either of such defendants liable in this case only if you find that they were deliberately indifferent according to the instructions I am about to give you."

The trial court refused that instruction and instead instructed the jury: "That [a] prison official knew of facts that he strongly suspected to be true and those facts indicated a substantial risk of harm to an inmate, the official cannot escape liability merely because he refused to take the opportunity to confirm those facts. [¶] . . . [¶] But keep in mind that mere carelessness or negligence is not enough to make an official liable. It is not enough for plaintiffs to show that a reasonable person would have known or that defendants Jerry Harper and/or Xavier Ruiz should have known of the risk to the plaintiffs. Plaintiffs must show that the defendant or defendants actually knew of the risk."

A prison official's liability on a claim under section 1983 may not be based on negligence, but requires a showing of intentional, knowing, or reckless conduct.

(*Farmer*, *supra*, 511 U.S. at p. 834.) The trial court's instruction adequately stated the law on that issue.

Moreover, the proposed instruction was not an accurate statement of the law in that it posits that Harper's and Ruiz's liability could not be based "upon any allegation or finding that they acted . . . unreasonably." As so stated, the proposed instruction in effect reversed the requirement that to find liability, the jury must determine that defendants failed to take reasonable measures to deal with a known risk, among other elements as set forth in *Farmer*. The trial court may reject a requested instruction that contains incorrect statements of law. (*Levy-Zentner Co. v. Southern Pac. Transportation Co.*, *supra*, 74 Cal.App.3d at p. 782.)

6. Requested Instruction on Constraints on Officials' Authority

Harper and Ruiz proposed special instruction No. 21, as follows: "If you find that Defendant Jerry Harper or Defendant Xavier Ruiz failed to act in response to such a risk, but could not have acted to avert due to a lack of authority or ability to do so, you cannot find that they consciously disregarded the risk." Harper and Ruiz argued that the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.) and the memorandum of understanding that governed CYA employees' rights precluded Harper and Ruiz from firing Shelby. The trial court denied the instruction, stating: "But I don't think an MOU or civil service protections are violation of the law."

Harper and Ruiz argue that the proposed instruction was based on *Williams v. Bennett* (11th Cir. 1982) 689 F.2d 1370, 1384, in which the court stated: "There can be

102

no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party. One may be callously indifferent to the fate of prisoners and yet not liable for their injuries. Those whose callous indifference results in liability are those under a duty—possessed of authority and means—to prevent the injury."

While the trial court's instruction did not explicitly address the issue, it did set forth the requirement that to be found liable, the jury had to find that defendants disregarded a known risk by failing to take reasonable measures. Implicit in the requirement of reasonableness is that the defendants had authority and ability to take particular measures.

Moreover, "[i]nstructions are to state rules of law in general terms and avoid reciting matters of evidence. Instructions that unduly emphasize issues or theories, either by singling them out or making them unduly prominent, are improper." (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 725-726.) The proposed instruction arguably violated this rule because it highlighted an aspect of Harper and Ruiz's evidentiary theory, i.e., that they acted reasonably because official constraints on their authority precluded other action.

7. Instruction Given on Policies and Practices Claim

The trial court instructed the jury in special instruction No. 7 that Harper and Ruiz could be held liable for the "adoption of policies and practices or failure to adopt policies and practices which caused [a] risk [that Shelby would coerce wards into sex] to exist,"

103

and stated: "As described elsewhere in these instructions, there are several particular elements which you must find in order to find that either defendant Jerry Harper . . . [¶] . . . or defendant Xavier Ruiz was deliberately indifferent under either of these theories."

8. <u>Requested Instructions on Policies and Practices Claim</u>

Harper and Ruiz proposed special instruction No. 26, as follows: "The third element that must be established in order for you to find that either Defendant Jerry Harper or Defendant Xavier Ruiz was deliberately indifferent with respect to their policies or practices is that the policy in question created a substantial risk that Defendant James Shelby would force wards into sex." The trial court agreed to give that instruction with modifications.

Harper and Ruiz submitted a modified special instruction No. 26, as follows: "In order for you to find that either Defendant Jerry Harper or Defendant Xavier Ruiz was deliberately indifferent with respect to their policies or practices, you must find that the policy in question created a substantial risk that Defendant James Shelby would force wards into sex." However, the trial court failed to read it to the jury.

Harper and Ruiz proposed special instruction No. 27, as follows: "The fourth element that must be established in order for you to find that either Defendant Jerry Harper or Defendant Xavier Ruiz was deliberately indifferent with respect to their policies or practices is that the defendant in question personally believed that such policy created a substantial risk that Defendant James Shelby would force wards into sex." The trial court refused the proposed instruction.

Harper and Ruiz proposed special instruction No. 28, as follows: "The fifth element that must be established in order for you to find that either Defendant Jerry Harper or Defendant Xavier Ruiz was deliberately indifferent with respect to their policies or practices is that the defendant in question consciously disregarded the risk which the defendant believed existed." The trial court refused the proposed instruction on the ground it was covered in another instruction.

Harper and Ruiz proposed special instruction No. 29, as follows: "In order to find that either Defendant Jerry Harper or Defendant Xavier Ruiz consciously disregarded the risk created by his policy or practice, you must find that the defendant in question was aware of a pattern of sexual assaults being committed by his employee or that the risk of such harm was so great and obvious that the failure of such defendant to respond will alone support the finding that such defendant consciously disregarded the risk." The trial court refused the proposed instruction on the ground it was covered by other instructions.

Harper and Ruiz proposed special instruction No. 31, as follows: "The sixth element that must be established in order for you to find that either Defendant Jerry Harper or Defendant Xavier Ruiz was deliberately indifferent with respect to their policies or practices is that the defendant in question's actions or omissions with conscious disregard was the cause of the Plaintiff in question being forced into sex by Defendant James Shelby." The trial court refused the proposed instruction.

Harper and Ruiz also requested that the special verdict form include each of the elements of the cruel and unusual policy claim. The trial court denied the request.

We first note that modified proposed special instruction No. 26 did not differ in any material respect from the initial proposed instruction; rather, it merely omitted the statement that the instruction addresses the third element. Nonetheless, the trial court's instructions failed to identify the elements of a claim based on policies and practices. Although in special instruction No. 7 the trial court stated that the particular elements of the claim were described elsewhere in the instructions, Harper and Ruiz complain that the trial court never described the additional elements of the policy claim or gave any further instruction on the issue. We agree that the trial court erred in this regard. We believe the error harmless, however.

As previously noted, there are two alternative theories by which plaintiffs can establish "deliberate indifference" on the part of Harper and Ruiz.

For a prison official to be found deliberately indifferent *under a failure to protect theory*, the plaintiff must prove that: (1) the official personally actually knew of facts from which the inference could be drawn that there was a substantial risk of such injury occurring; (2) the official in fact subjectively drew such inference; and (3) the official consciously or recklessly disregarded the risk. (*Farmer*, *supra*, 511 U.S. at pp. 836-840, 846-847.)

"[T]o hold a supervisor liable [for deliberate indifference] *because his policies or practices* led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the

supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." (*Beers-Capitol v. Whetzel, supra*, 256 F.3d at p. 134, italics added.)

Looking initially to the first alternative, and as already discussed, there was substantial evidence to support a finding of liability on the "failure to protect" theory. Further, the jury was properly instructed on the "failure to protect theory." Most importantly, the jury was told that "[t]o show deliberate indifference, plaintiff must show that defendants Jerry Harper and/or Xavier Ruiz knew of a substantial risk that plaintiff would be coerced into sex, and that the defendants disregarded that risk by failing to take reasonable measures to deal with them."

As to the second manner of establishing deliberate indifference "because of policies or practices," there was virtually no evidence to support a verdict; further, the jury was, in essence, not instructed on the theory. The only reference to "policies or practices" in the instructions was as follows: "In order to find defendant James [*sic*] Harper or Xavier Ruiz liable . . . you must find that such defendant was deliberately indifferent to a certain type of risk of misconduct by defendant James Shelby . . . *under two alternative theories.* [¶] Either, one, a failure by the given defendant to protect plaintiffs from risks—from a risk which defendant James Shelby posed to force wards into sex, or; [¶] The given defendant's adoption of policies and practices or failure to adopt policies and practices which caused such risk to exist. [¶] As described elsewhere in these instructions, there are several particular elements which you must find in order to

107

find that either defendant Jerry Harper — [¶] . . . —or defendant Xavier Ruiz was deliberately indifferent under either of these theories." (Italics added.)

Based on the fact that there was little to no evidence on "policies or practices," and the jury was, in essence, not instructed on the theory, it would appear clear that the jury did not rest its verdict on this theory. Additionally, one need look no further than the special verdict, to know that the failure to completely instruct on "policies and practices" was harmless. The special verdict returned by the jury dealt only with the "failure to protect" theory. There was no reference in the verdict form to any of the elements on the "policies and practices" alternative. The pertinent questions on the special verdict forms were:

"4. Was *plaintiff* [name] imprisoned under conditions that exposed him to a substantial risk of serious harm and/or sexual abuse?"

"5. Did *defendant* [Harper/Ruiz] know the conditions created a substantial risk of serious harm and/or sexual abuse and disregard that risk by failing to take reasonable measures to correct it?"

"6. Was *defendant* [Harper/Ruiz]'s conduct a substantial factor in causing harm to *plaintiff* [name]?"

In answering questions 4 and 5, the jury necessarily concluded that plaintiffs were being exposed to a substantial risk of sexual abuse by Shelby, and that Harper and Ruiz knew of this substantial risk and did nothing to protect plaintiffs from the abuse. The jury's affirmative answers to questions 4 and 5 correlate directly to the elements of the

108

"failure to protect" theory, wherein: (1) the official personally actually knew of facts from which the inference could be drawn that there was a substantial risk of such injury occurring; (2) the official in fact subjectively drew such inference; and (3) the official consciously or recklessly disregarded the risk. (*Farmer*, *supra*, 511 U.S. at pp. 836-840, 846-847.)

There is absolutely no reference in the special verdict as to the elements of alternative two wherein: "(1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." (*Beers-Capitol v. Whetzel*, *supra*, 256 F.3d at p. 134.)

Lastly, a review of the closing arguments indicate that there was basically no discussion of the "policy and practices" theory. Any error in failing to completely instruct on the theory of "policies and practices" is thereby harmless.

9. <u>Requested Special Instruction on Deference to Prison Officials' Judgment</u>

Harper and Ruiz proposed special instruction No. 5B, as follows: "In determining whether defendant Jerry Harper and/or defendant Xavier Ruiz violated plaintiffs' 8th Amendment rights as alleged, you should give deference to the judgment of prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security in the prison." Defendants claim the court erred in failing to give this jury instruction. We disagree.

109

The proposed instruction was based on *Norwood v. Vance* (9th Cir. 2010) 591 F.3d 1062. In that case, a prisoner, over a period of two years, underwent four separate lockdowns. The lockdowns were initiated as a result of inmate assaults on both staff and fellow inmates. The plaintiff complained under section 1983 that as a result of the lockdowns he was deprived of his use of the exercise yard. "In considering whether defendants were deliberately indifferent to the need for outdoor exercise, the jury should consider that defendants had a competing obligation under the Eighth Amendment to ensure the safety of prisoners, including protecting prisoners from each other. In considering these factors, you should give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security in a prison." (*Id*. at p. 1066.) "[P]rison officials have a duty to keep inmates safe, and in particular to protect them from each other. [Citations.] Officials must balance this imperative against other obligations that our laws impose, such as providing outdoor exercise. When violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control. We've explained that 'prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost. This is for the benefit of the prisoners as much as for the benefit of the prison officials.'" (*Id.* at p. 1069.)

To the extent the jury instruction referencing deference to prison officials' judgment is associated with liability premised on "policies and practices," we believe that

110

a failure to give said instruction is harmless. As previously discussed, the jury clearly based its liability finding on a "failure to protect" theory.

Further, the deference instruction applies to situations in which a prison official must balance two competing interests in the decision-making process. Here, there is nothing to balance. There is no competing interest. Nothing is to be gained by the institution or the prisoners in allowing Shelby's sexual misconduct to continue. There is no balanced decision to defer to.

As stated most recently in *Chess v. Dovey* (9th Cir. 2015) 790 F.3d 961, "where the parties do not put into issue a security-based policy, the deference instruction has no 'foundation in the evidence' and should not be given." (*Id.* at p. 973.)

R. *Exclusion of Harper and Ruiz's Proffered Evidence*

Harper and Ruiz contend the trial court repeatedly denied their requests to introduce evidence. Specifically, they contend the trial court erred in refusing to admit exculpatory evidence contained in the reports of witness interviews and in refusing to enter those documents into evidence in their entirety. To cite just a few examples, during cross-examination of Ruiz, counsel for Shelby asked him if he had seen a document that had been attached to the report regarding the Delgado grievance. Ruiz testified that the document supported the investigator's conclusion not to sustain the grievance. Ruiz replied that he "would have" reviewed that document; however, the trial court sustained an objection from Ruelas's counsel on the ground of hearsay, among other objections. Similarly, the trial court sustained objections when the investigator himself testified. The

111

trial court also denied requests to enter the documents into evidence in their entirety, as they had been received by Harper and Ruiz.

The information that was made known to Ruiz and/or Harper was admissible over plaintiffs' hearsay objections because the information went only to their notice, not to the truth of the matter asserted. Moreover, that information was highly relevant to the critical issues of their actual knowledge and their subjective beliefs. Finally, the evidence was admissible under Evidence Code section 356, which provides: "Where part of . . . [a] writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party[.]" We conclude the trial court erred in excluding the proffered evidence. While we find error, given the cumulative nature of the evidence, we believe it harmless.[9]

Harper and Ruiz contend the October 3, 2000 OIG report was inadmissible hearsay because it included summaries of other documents. However, the report was admitted not to establish the truth of any statement contained in the report, but to demonstrate the extent of Harper and Ruiz's notice of the report's contents. As such, the report was not hearsay. For the same reasons, we reject Harper and Ruiz's contention that the trial court erred in admitting the report under Evidence Code section 702, subdivision (a), because plaintiffs never established that the author of the report had personal knowledge of the statements in the report.

---

[9] The record contains ample evidence that investigators concluded that accusations were unsupported or not sustained.

Harper contends the October 3, 2000, OIG report was irrelevant as to his knowledge because, among other things, he knew the OIG was overly critical of the CYA and not objectively reliable. His contentions go to the credibility of the report, not to its relevance and, therefore, provide no basis for exclusion of evidence offered to show notice.

Ruiz contends the October 3, 2000, OIG report was irrelevant as to him because he never saw it and was unaware of its contents. "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355.) The trial court has no sua sponte duty to give such an instruction. (See, e.g., *People v. Hajek and Vo* (2014) 58 Cal.4th 1144.) Ruiz has not shown that he requested such an instruction.

Harper and Ruiz challenge the admission of evidence that allegations were made against Shelby in 1999 for allowing a ward to have access to confidential files, for leaving his post, and for being dishonest in telling Rivera about a rumor and in using a false name to get Rivera to take a telephone call. They also challenge evidence of the Galustian cake incident. We do not agree that such evidence was irrelevant to show notice or knowledge that Shelby presented a risk of sexual misconduct toward wards. (*Farmer*, *supra*, 511 U.S. at p. 848.) Based on the evidence as a whole, this was part and parcel of Shelby's conduct, to reward and coerce wards into engaging in sexual conduct.

Harper and Ruiz argue that the allegations of several wards were irrelevant because, although they were related to sex, they "had nothing to do with [their] knowledge of any risk of the sexual assaults." Those allegations included Perez's allegation that Shelby made some sexual comments to him while moving his hand down Perez's hip; Walker's allegation that Shelby said he "could handle" Walker and grabbed his buttock while handcuffing him; and Tanori's allegation that Shelby "sexually harassed" him. We disagree.

The October 3, 2000, OIG report specifically identified the Perez incident as requiring closer attention: "Based on its review of ward Perez's allegations and the history of Shelby's past behavior, the Office of the Inspector General believes that action should have been taken to fully investigate Perez's grievance and disciplinary appeal issues involving possible inappropriate sexual misconduct by Shelby." Thus, in our view, Perez's allegation was highly relevant on the issue of notice of the likelihood of Shelby's sexual misconduct, and Walker's similar allegation was relevant for the same reason. Tanori's allegation was never investigated, so the meaning of his underlying complaint was never determined. Ruiz's failure to order a complete investigation of that allegation was one of the critical elements of plaintiffs' case against him.

Harper and Ruiz further contend that the Perez, Delgado, Walker, and Guerrero-Valles allegations were irrelevant and inadmissible because they were found to be unsupported by evidence after investigation and, therefore, did not establish the required objective strong likelihood or substantial risk that Shelby would sexually assault wards.

114

Again, Harper and Ruiz's objection goes merely to the probative value of such evidence, not to its admissibility.

S. *Prejudicial Effect of Errors As to Harper and Ruiz*

To summarize, we have found error in: (1) the trial court's refusal to give proffered instructions on a claim based on policy or practice; (2) the admission of irrelevant evidence against Harper and Ruiz, specifically, among other things, evidence that was discovered after Shelby left Stark and, therefore, could not have established knowledge or notice; (3) not allowing into evidence certain exculpatory comments found in various investigative reports; and (4) the admission of evidence relative to "meetaninmate.com" and Shelby engaging in sexual conduct at a motel with former inmate Girard. As to Harper, we also find error in admitting polygraph results into evidence. We find these errors however, harmless.

As indicated *ante,* a judgment should be reversed only when an appellant shows that a miscarriage of justice has occurred. (Cal. Const., art. VI, § 13.) A miscarriage of justice is shown when, after examination of the entire cause, including the evidence, it is reasonably probable that a result more favorable to the appellant would have been reached in the absence of the error. (*Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at pp. 800-802.) Multiple errors may be found cumulatively prejudicial, even though independently they would have been deemed harmless. (*Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 141.) As previously discussed, the error concerning the failure to instruct on policy and practice was harmless because the case did not go to the jury on

that theory. It is clear that the verdicts against Harper and Ruiz were based on a failure to protect.

Also harmless was the admission of evidence of Shelby's conduct involving wards Canas, Salcido, Navarette, and Ortiz, conduct of which it was not shown that Harper or Ruiz was on notice of. While the evidence should not have been admitted for purposes of notice, one cannot say that it is reasonably probable that a result more favorable to Harper and Ruiz would have been rendered in the absence of the error. Properly before the jury on the issue of notice was Shelby's conduct involving: Edward Rivera, Ricardo Tovar, Jason Perez, Daniel Guerrero-Valles, Armando Tanori, Tomas Delgado, Tyrone Walker, and Paul Johnson.[10] It simply cannot be said that a different verdict would have been rendered in the absence of the inadmissible evidence. Further, as to the argued error in not allowing certain portions of the investigative reports into evidence, it was harmless because of the cumulative nature of the evidence. The jury had before it evidence that investigators had found some of the accusations to be unsubstantiated. Lastly, as to the evidence of "meetaninmate.com," and Shelby meeting Girard in a motel, no reasonable juror would think that Harper or Ruiz should have known of said conduct.

The judgments in favor of Ruelas, Miranda, and Espinoza are affirmed. As to Mendoza, the judgment is reversed.

---

[10] There was no evidence that Harper was aware of the Tanori, Delgado, and Johnson incidents.

T.  *Attorney Fees*

The trial court's award of attorney fees was joint and several; the trial court did not identify fees attributable to specific claims and defenses.

We agree with defendants that attorney fees under title 42 United States Code section 1988 should be awarded to the respective party plaintiffs, as opposed to their attorneys.  (*Astrue v. Ratliff* (2010) ___ U.S. ___ [130 S.Ct. 2521, 2529]; *Venegas v. Mitchell* (1990) 495 U.S. 82, 87-88; *Evans v. Jeff D*. (1986) 475 U.S. 717, 730-731.) Further, the judgments recovered by each individual plaintiff are severable from each of the other plaintiffs; as such, each plaintiff is responsible for his own attorney fees, and the judgment should so reflect.  (*Emery v. Pacific Employers Ins. Co.* (1937) 8 Cal.2d 663, 666 ["Each plaintiff recovers upon his separate cause of action.  No plaintiff has any interest in the sum awarded to another plaintiff."]; Code Civ. Proc., § 378 subd. (b) ["Judgment may be given for one or more of the plaintiffs according to their respective right to relief."].)

Defendants contend that plaintiffs' counsels' fees are excessive.  We disagree.[11]

An applicant for attorney fees under title 42 United States Code section 1988 "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."  (*Hensley v. Eckerhart* (1983) 461 U.S.

---

[11] Discussion of Mr. Dordick's fee enhancement will be discussed, *post*.

424, 437.)  The fee award should be one that is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case" and "'adequate to attract competent counsel, but that does not produce windfalls to attorneys.'" (*Perdue v. Kenny A.* (2010) 559 U.S. 542, 552 (*Perdue*).)

"'We review the trial court's award of attorney fees under [title 42 United States Code] section 1988 for an abuse of discretion.'  [Citation.]  ""'[T]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.'"  [Citations.]'  [Citation.] . . . We defer to the trial court's discretion 'because of its "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual maters." [Citation.]'  [Citation.]  The California Supreme Court has explained, '"The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong[']"—meaning that it abused its discretion. . . .'" (*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 418.)

The clerk's transcript contains approximately 1,100 pages of billing documents; the billing identifies the task performed, the amount of time spent, and the attorney performing the work.  While defendants may wish to characterize these documents as a

118

billing compilation or block billing, the time accounted for is as detailed as any client could expect.[12]

This case was in active litigation before the trial court for over seven years. Trial spanned approximately six months. From the record, it appears that all counsel were well prepared and fought to the bitter end. While liability for each plaintiff was premised, for the most part, on the same facts, each plaintiff was nonetheless entitled to individual representation through all stages of discovery and at trial.

In viewing the billing for the main plaintiffs' attorneys, each attorney billed for slightly over 400 hours of trial time, with trial preparation ranging from 590 to 1,236 hours. It cannot be said that the time spent did not fall within the range of what would be expected on a case of this nature.

Defendants argue that the hourly fees charged are not in line with what attorneys in the "relevant community" (i.e., San Bernardino County) would charge. We believe defendants too narrowly constrict the "relevant community," as it relates to handling complex civil rights litigation. It must first be noted that none of the attorneys participating in the present matter are from San Bernardino County. Two are from Orange County and four are from Los Angeles County. This, in and of itself, supports

_____

[12] In light of the record containing almost 1,100 pages of fairly specific billing, we find defendants' arguments relative to plaintiffs' failure to produce raw billing documents unmeritorious. Further, given the specificity of the billing documents, it was well within the trial court's discretion to deny defendants' motion to conduct discovery relative to plaintiffs' counsels' time records. (See *Riverside Sheriffs' Assn. v. County of Riverside* (2007) 152 Cal.App.4th 414, 424-425 [Fourth Dist., Div. Two].)

the notion that at present the "relevant community" is the greater Los Angeles area. (See *Gates v. Deukmejian* (9th Cir. 1992) 987 F.2d 1392, 1405.) Further, we find it hard to accept the argument that Mr. Goldstein's hourly rate of $407 and Ms. Eisenberg's hourly rate of $500 are excessive, even if limited to attorneys in San Bernardino County.[13] Lastly, there is ample evidence in the record to support the trial court's conclusion that the hourly rate for all three lead attorneys was reasonable and within the norm of the "relevant community."[14]

As to the fee award for time spent by Richard Pearl, we cannot say the trial court abused its discretion in allotting some attorney time to Mr. Pearl. Certainly, 98 percent of his declaration appears to be that of an expert, as opposed to an attorney. Yet attached to Mr. Pearl's declaration are billing records which reflect work more akin to that of a lawyer than as an expert. We therefore find no error. (See *Davis v. City and County of San Francisco* (9th Cir. 1992) 976 F.2d 1536, 1544.)

Lastly, we address the issue of enhanced fees to Mr. Dordick.

As for Mr. Dordick, Ms. Eisenberg, and Mr. Goldstein, a review of the record demonstrates they did an extremely good job. From a plaintiff's perspective, this is an

---

[13] Mr. Dordick's hourly fee will be discussed, *post*, when we address the enhancement.

[14] We recognize that Ms. Eisenberg's hourly rate for her involvement in the fees motion was $150 more per hour than for her work on the substantive portion of the case. Given that she was the main attorney as it relates to the compilation of all the billing documents, we cannot say that the trial court was "clearly wrong" in approving the fees.

extremely tough case. While the defendants' alleged conduct is egregious, the case was nonetheless problematic from the beginning.

Given the issues of credibility, as well as difficulty in proving liability, we believe few attorneys would have taken the case. It is a case with little to no chance of settlement with years of attorney time expended, and compensation totally dependent on a roll of the dice before a jury. While the outlay of advanced costs in and of itself is not extraordinary when compared to larger contingency fee cases, it was a substantial out-of-pocket risk given the prospects of success. Lastly, from the date of filing to the present time, the matter has lasted 11 years with no remuneration to plaintiffs' counsel.

We now turn to *Perdue*. "[T]here is strong presumption that the lodestar is sufficient; factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." (*Perdue*, *supra*, 559 U.S. at p. 546.) In addressing the sufficiency of the lodestar method in calculating attorney fees, the court indicated that the ultimate goal is to award a reasonable fee, "one that is adequate to attract competent counsel . . . ." (*Id.* at p. 552.) "[W]e have never sustained an enhancement of a lodestar amount for performance, . . . we have repeatedly said that enhancements may be awarded in '"rare"' and '"exceptional"' circumstances. [Citations.] [¶] [T]he novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors 'presumably [are] fully reflected in the

121

number of billable hours recorded by counsel.' [Citations.] We have also held that the quality of an attorney's performance generally should not be used to adjust the lodestar '[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate.' [Citation.]" (*Id.* at pp. 552-553.)

The court continued however by indicating that "superior attorney performance" would justify an enhancement if it could be determined that the lodestar amount did not "adequately measure the attorney's true market value, as demonstrated in part during the litigation." (*Perdue*, *supra*, 559 U.S. at pp. 554-555, fn. omitted.) Further, in determining the propriety of an enhancement, the trial court should look to whether there was an "extraordinary outlay of expenses" and whether the litigation was "exceptionally protracted." (*Id.* at p. 555.)

Finally, the "fee applicant seeking an enhancement must produce 'specific evidence' that supports the award" (*Perdue*, *supra*, 559 U.S. at p. 553), and the "judge [must] provide a reasonably specific explanation for all aspects of a fee determination, including any award of an enhancement" (*id.* at p. 558).

We begin by noting that Mr. Dordick's fee was $850 per hour. It was a little over two times Mr. Goldstein's hourly fee and 1.7 times Ms. Eisenberg's hourly fee. Based on *Perdue*, we feel compelled to conclude that Mr. Dordick has, for the most part, been remunerated for the quality of his representation. As he states in his declaration: "My requested hourly rate, based upon 23 years of extensive trial experience, reputation, and

122

year of admission (1987), is $850/hour . . . I think that my requested hourly rate of $850/hr is more than fair given the quality of my work and my unique experience of having obtained several substantial verdicts in the Inland Empire and in other surrounding areas."

We do not believe, however, that this ends the inquiry. In his declaration, Mr. Dordick expressed his belief that defendants "unnecessarily create[d] work and obstacles to the litigation." He further declared: "The inordinate length of this trial also impacted my existing cases. I never anticipated that it would take so long to get to trial and that the trial, itself, would take another 1/2 a year. I had to delay my typical Trial workload, which is at least 4 trials a year on average, and continue all other matters. That has caused a significant hardship, because I have essentially been in back-to-back trials since about a month after the completion of the trial in the case at bar. I have had 3 jury trials already and just started my 4th trial in a wrongful death case, expected to take about a month. I have 2 more trials that must start before the end of the year. But for the 6 month trial in the case at bar, I could have spread those other trials out so as not to become a physical and emotional strain. [¶] . . . In addition, the impact of waiting another 2 years during the appeal in this case to recover the over $218,000 . . . that I advanced as costs and to wait to be paid the reasonable value of my services is also financially debilitating. The loss of the use of those funds substantially impacts my law practice and my ability to advance costs for other clients. Also, I had to reject cases during the last 10 months, since I was unavailable due to the needs of this case. I only

123

accept cases with values in excess of one-million dollars, so losing a few cases impacts my practice substantially."

Mr. Dordick's involvement in the present matter appears to have been for four years. Based on time sheets, approximately 10 months of this four-year period was dedicated to this case. Given this time dedication, Mr. Dordick states that he had to continue numerous trials. Missing from his declaration, however, is the specificity as to how long those trials had to be postponed and the impact this had on his clients or his business. Also, while Mr. Dordick declares that he had to reject cases during the last 10 months, there is no description of the cases, whether the cases were referred out, or whether he would have taken the cases had he not been in trial. Lastly, while this matter has dragged on, it is unclear from the record whether this is attributable to defendants, plaintiffs, or simply a matter of the complexity of the litigation.

Here, the trial court awarded a .5 enhancement on the lodestar fee of Mr. Dordick. Aside from the complexity of the case and the exceptional job done by Mr. Dordick (which we believe under *Perdue* is, for the most part, included within the lodestar), the trial court supported its decision to award a .5 enhancement on the basis that: "Mr. Dordick is a sole practitioner. He has advanced over $300,000 in costs to proceed with the case through trial. His ability to handle other cases during the six month's trial was, of course, limited. His ability to take in new cases during this period [of] time was, of course, limited."

While this general conclusion may be true, under *Perdue*, we feel compelled to reverse and remand for further hearing as it relates to the enhancement. As stated by the majority in *Perdue*, the "fee applicant seeking an enhancement must produce 'specific evidence' that supports the award" (*Perdue*, *supra*, 559 U.S. at p. 553), and the "judge [must] provide a reasonably specific explanation for all aspects of a fee determination, including any award of an enhancement" (*id.* at p. 558). On the present record, we believe the specificity required by both the fee applicant and the trial court is somewhat lacking.

On remand, after further hearing and evidence as to the enhancement, the quality of the representation by Mr. Dordick and the complexity of the case should not be considerations in the award of an enhancement. (These factors are taken into consideration in the lodestar.) As to the length of Mr. Dordick's involvement in the case, the length of the trial, the disruption, if any, of counsel's practice, and a reasonable return on the costs expended and fees earned, the trial court should, as much as possible if it feels that an enhancement is appropriate, employ a method of calculation that is objectively reasonable and subject to review.[15]

---

[15] When dealing with a delay for the reimbursement of costs, the amount of the enhancement "must be calculated using a method that is reasonable, objective, and capable of being reviewed on appeal . . . ." (*Perdue*, *supra*, 559 U.S. at p. 555.) As to any inordinate delay in the payment of fees, "[c]ompensation for this delay is generally made 'either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present day value.'" (*Id.* at p. 556.)

While an award of attorney fees is not "'a form of economic relief to improve the financial lot of attorneys,'" the underlying "aim is to enforce the covered civil rights statutes." (*Perdue*, *supra*, 559 U.S. at p. 552.) While the trial court, which is familiar with the discovery process and trial of the present matter, is in the best position to judge, the record on appeal reflects what one might say is a problematic plaintiff's case. While certainly there are extremely competent plaintiff's attorneys in Eastern Los Angeles County and San Bernardino County, it is questionable whether their interest would turn to a case of this nature. Out-of-pocket costs of $300,000 for larger injury cases is by no means out of the question. However, under what appears to be problematic facts, it is an enormous risk; we believe the same can be said for the investment of time.

We are viewing a cold record; the trial judge familiar with the discovery and trial of the case is in the best position to determine the entitlement to and, if appropriate, the amount of an enhancement. The matter is therefore remanded for this purpose.

## IV. DISPOSITION

The judgment in favor of Mendoza and against Shelby is reversed. The judgments in favor of Ruelas, Espinoz, and Miranda and against Shelby, Harper and Ruiz, including the lodestar attorney fee awards for all counsel, are affirmed, except that the portion of the judgments awarding a fee enhancement for Mr. Dordick is reversed. The matter is remanded for further proceedings, consistent with this opinion, for a determination of the propriety of and, if appropriate, the amount of fee enhancement to be awarded for Mr. Dordick. The matter is further remanded with directions to correct the judgments to

126

reflect that attorney fees and costs are awarded to Ruelas, Espinoza, and Miranda, rather than to their attorneys.

Each party shall bear their respective costs on appeal. (Cal. Rules of Court, rule 8.278.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING

J.

We concur:

McKINSTER

Acting P. J.

CODRINGTON

J.